# Exhibit "E"

**Operating Agreement**

**of**

_____, **LLC**

A Nevada Limited Liability Company

     This Operating Agreement (the "Agreement") of _____, **LLC** (the "Company") is made and entered into effective as of the \_\_\_\_ day of _____, 201\_\_ (the "Effective Date"). The Company's Manager and Members shall be as set forth in this Agreement. Capitalized defined terms shall have the meaning set forth in Section 11.11 or in the Section in which such terms are otherwise defined.

# R E C I T A L S

     A.     A group of lenders (individually, a "Lender" and collectively, the "Lenders") invested in a loan (the "Loan") arranged by Integrated Financial Associates, Inc. ("IFA"), to _____, a _____ (the "Borrower") in the amount of _____Dollars (\$_____). The amount and percentage interest of each Lender's interest in the Loan, based on dollar amount (the "Percentage Interest in the Loan"), is set forth on <u>Exhibit A</u> attached. The Loan was evidenced by a promissory note (the "Note"), a copy of which is attached as <u>Exhibit B</u>. Payments with respect to the Note were secured by a deed of trust (the "Deed of Trust") on certain real property (the "Real Property") in the city of _____, _____ County, _____. The identity of and a legal description of the Real Property is set forth in <u>Exhibit C</u> attached.

     B.     In connection with the Loan, each of the Lenders entered into a loan servicing agreement (each a "Servicing Agreement") with IFA, which designated IFA as the Lenders' servicing agent for the Loan, subject to certain restrictions and requirements as more fully set forth in the Servicing Agreement.

     C.     The Borrower defaulted under the terms of the Note, and on or about _____, [the Borrower executed a deed in lieu of foreclosure (the "Deed") conveying fee simple title into _____, LLC / IFA commenced foreclosure on the Real Property]. IFA formed the Company to hold title to the Real Property. Any Lender who does not agree to become a member of the Company (a "Non Participating Lender") will become a fee simple tenant in common owner of the Real Property in a percentage equal to his / her / its Percentage Interest in the Loan.

     D.     On or about _____, 201\_\_, IFA caused Articles of Organization of the Company to be filed with the Nevada Secretary of State, in which _____ (the "Manager") was named as the manager of the Company.

     E.     This Agreement contemplates that each Lender shall contribute to the Company, as a contribution to the Company's capital, all of such Lender's right, title, interest and/or claim (in the percentage and dollar amount set forth on Exhibit "A" hereto) in the Loan, the Note, the Deed of Trust, and/or the Real Property, as the case may be (collectively, the "Lender's Investment Interest"). The Lenders' contributions of each such Lender's Investment Interest described above in this Paragraph E is also hereinafter referred to as a "Contribution" and collectively as the "Contributions". This Agreement shall initially be executed by Manager as the Company's Manager. Immediately after execution by Manager, this Agreement shall be delivered by the Manager to each Lender with a request to execute and deliver this Agreement to IFA. Only those Lenders who execute and deliver this Agreement to IFA on or before _____, 20\_\_\_ shall be considered to be and shall be referenced as the "Members" and those Lenders who do not execute and deliver

this Agreement to IFA on or before _____, 20__ shall be referenced as the "Non-Participating Lenders".

      F.     Each Member shall have a "Percentage Interest in the Company" initially equal to such Lender's Percentage Interest in the Loan, provided, however, that such Member's Percentage Interest in the Company may be adjusted as provided in Section 3.1.1 below or elsewhere in this Agreement. Each Member shall have that percentage interest in the "Profits" and "Losses" (as defined below), the assets, properties, deductions and credits of the Company equal to the Percentage Interest in the Loan of each such Member.

      G.     The Company shall be a "manager-managed" limited liability company under Nevada law with the Members electing the manager of the Company under Nevada law as hereinafter provided. Except as otherwise provided below, the Company shall have one Manager. The Company shall be managed as provided in Section 3.4 below.

      H.     The Company shall have the right to assess the Members for additional cash contributions (the "Additional Assessments" as defined in Section 4.1.2(A) below) to the Company to meet "Operating Expenses" (as defined in Section 4.1.2(B) below) of the Company if the "Cash Flow" (as defined in Section 11.11 below) of the Company is otherwise insufficient to meet such Operating Expenses. Such Additional Assessments shall be strictly proportionate to each Member's Percentage Interest in the Company. If any Member fails to make contributions of such Member's share of the Additional Assessments when due, then the other Members and/or the Non-Participating Lenders may offer to make loans or the Manager may solicit loans from the other Members and/or the Non-Participating Lenders to the Company (the "Cover Loans," as defined in Section 4.1.2(C) below) to cover the "Deficiency Amount" (as defined in Section 4.1.2(C)(1) below). The Additional Assessments and Cover Loans shall bear interest at the "Default Rate" (as defined in Section 4.1.2(C) below). Upon the sale, exchange or other disposition of all or any portion of the Real Property, the Company shall distribute the proceeds as provided in Section 5.2.2. Cash Flow shall be distributed as provided in Article V and the proceeds from a dissolution shall be distributed as provided in Article VIII.

**AGREEMENT**

      Now therefore, intending to be legally bound, and for good and valuable consideration, the receipt of which is hereby acknowledged, the Members agree as follows:

ARTICLE I
ORGANIZATION

      Section 1.1    Formation. The Members hereby enter into this Agreement for the purpose of establishing the terms and conditions upon which the Company will conduct its business operations as a limited liability company organized under the laws of the State of Nevada as now in force or as hereinafter amended (the "Nevada Act") setting forth the rights and obligations of the members of such limited liability company. This Agreement shall regulate the internal affairs of the Company and the relations of the Members of the Company among themselves as set forth herein and therein.

      Section 1.2    Name. The name of the Company shall be _____, LLC. The Company may do business under such other or additional names as a Company Majority (as defined in Section 3.4.3(B) below) may, from time to time, consider appropriate to conduct the business of the Company.

      Section 1.3    Articles of Organization; Qualification. The Articles of Organization of the Company were filed in the office of the Secretary of State of the State of Nevada on _____, 20___. The

2

Company intends primarily to operate within the State of Nevada and, to the extent required by the laws of the State of Nevada, the Manager shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in all other jurisdictions where the Company may be conducting business and such qualification is required. Each Member shall execute, acknowledge and deliver all articles and other instruments necessary or appropriate to qualify, continue or terminate the Company as a limited liability company in all jurisdictions in which the Company is authorized to conduct business. No Member, however, shall be required to qualify to do business in any foreign jurisdiction without its consent.

      Section 1.4     Tax Partnership Status. The Members intend that the Company shall be treated as a partnership for federal and state income tax purposes and this Agreement shall be construed in a manner that ensures the Company's classification as a partnership for federal and state income tax purposes at all times. Any provision of this Agreement that would have the effect of preventing the Company from being classified as a partnership for federal and state income tax purposes shall be null and void. The Members shall take all actions, and execute, acknowledge and deliver all documents, which are necessary or desirable to obtain and maintain the Company's classification as a partnership for federal and state income tax purposes at all times.

      Section 1.5     No State Law Partnership; No Member Liability to Third Parties. Except for federal and state income tax purposes as expressly provided in Section 1.4, above, the Members intend the Company shall not be treated as a partnership (including, without limitation, a limited partnership) or joint venture. No Member shall be a partner or joint venturer of any other Member for any purpose other than for federal and state income tax purposes, and this Agreement shall not be construed to suggest otherwise. The personal liability of a Member for the debts and obligations of the Company shall be limited to the amount of such Member's Initial Capital Contribution (defined below) as described in Exhibit D which such Member contributed to the total Loan amount of $_____. No Member shall be obligated to restore any deficit in his Capital Account, contribute money to the Company or to otherwise answer for any debt or obligation of the Company beyond its commitment to pay his, her or its agreed upon Initial Capital Contribution as defined in Section 4.1.1 and shown on Exhibit D. No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Nevada Act shall not be grounds for imposing personal liability on the Members for the debts and obligations of the Company.

ARTICLE II
PURPOSES AND POWERS; OFFICE; STATUTORY AGENT; TERM

      Section 2.1     Purposes and Powers. The sole purpose (the "Company Purpose") of the Company shall be to acquire, own, invest in, lease, manage, improve, sell and/or otherwise deal with the Real Property for the benefit of the Lenders. The Company is a limited liability company organized for the specific Company Purpose and the Company shall not own any property other than the Real Property (including income or funds derived from the sale, lease, development or other use of the Real Property) and funds received by the Company to meet Operating Expenses such as Cover Loans (defined below) or Additional Assessments (defined below). The Company shall not engage in any business or activity, or make any investment, other than with respect to the Company Purpose. The Company shall have all of the powers granted or permitted to a limited liability company under the laws of the State of Nevada, including, without limitation, the powers specifically enumerated in the Nevada Act, in order to accomplish the Company Purpose as set forth in this Section 2.1.

      Section 2.2     Office. The principal office of the Company and the office where the Company's books and records shall be maintained shall be at 3311 S. Rainbow Blvd., Suite 209, Las Vegas, Nevada 89146, or at such other or additional location or locations as the Manager may from time to time determine.

3

Section 2.3    Registered Office; Agent for Service of Process.    The registered office of the Company shall be at 3311 S. Rainbow Blvd., Suite 209, Las Vegas, Nevada 89146, or at such additional location or locations as the Manager may from time to time determine in their discretion. The statutory agent for service of process on the Company in the State of Nevada shall be _____, whose address is 3311 S. Rainbow Blvd., Suite 209, Las Vegas, Nevada 89146. The Manager shall have the power to cause the Company to revoke the appointment of any statutory agent and appoint a substitute or replacement statutory agent in its discretion.

Section 2.4    Term.    The Company shall have a term commencing upon the filing of the Articles as provided in Section 1.3. The term shall be perpetual, unless earlier dissolved or terminated pursuant to law or the provisions of this Agreement.

ARTICLE III
MEMBERSHIP AND MANAGEMENT

Section 3.1    Member's Interests.    The Company's "Member Interests", as that term is defined in §86.091 of the Nevada Act, represent the ownership interests of the Members in the Company. The authorized Member Interests of the Company shall be of a single class of Member Interests, with each "Member's Interest" having the same rights, privileges and responsibilities as each other Member's Interest, pro rata to such Member's Percentage Interest in the Company. The "Percentage Interest in the Loan" of each Member shall equal that percentage determined by dividing the amount of the Member's investment in the Loan, based on dollar amount, by $_____ (the current Loan balance).

3.1.1    Adjustment to Member's Percentage Interest in the Company.    Initially, it is contemplated that each Member's Percentage Interest in the Company shall be equal to such Member's Percentage Interest in the Loan. However, in the event that one or more Lenders elect not to become Members of the Company, the Percentage Interest in the Company of each Member shall be adjusted to equal that percentage determined by dividing the amount of the Member's investment in the Loan by the difference of $_____ (the current Loan balance), less the aggregate amount of the investment in the Loan of the Non-Participating Lender(s).

Section 3.2    Initial Members.    The initial Members shall be the Lenders who execute and deliver this Agreement to IFA as provided in Paragraph E of the Recitals. Each of the initial Members shall have that Percentage Interest in the Company (and the Company's assets, properties, rights and privileges) as set forth in Exhibit D, adjusted as provided in Section 3.1.1 above or elsewhere in this Agreement.

Section 3.3    Additional Members.    After the initial Members have been admitted to the Company, the Company shall admit additional Members only with the approval of a Company Majority; provided, however, that any Non-Participating Lender may become a Member of the Company at any time by executing a copy of this Agreement and delivering it to the Manager, and provided further, however, that those Persons who become Substitute Members by complying with the provisions of Section 7.1 below shall automatically become Members of the Company. Any admission of a new Member shall be effective only after the new Member has executed and delivered to the Manager an instrument which shall set forth the new Member's notice address and the written acceptance and agreement of such Member to be bound by all the provisions of this Agreement and which shall otherwise be in a form satisfactory to a Company Majority. Exhibit D shall be adjusted from time-to-time by the Manager to reflect the Members' revised Percentage Interest in the Company upon the addition of any Additional Member.

Section 3.4    Management.    Subject to the provisions of this Agreement, the Company shall be a "manager-managed" limited liability company and the Manager appointed as provided herein shall govern,

4

manage and direct the business and the affairs of the Company in the ordinary course of the Company's business and activities.

    3.4.1   Manager.

    (A)   In General.  Initially, the Company shall have one manager, which shall be _____. Any new Manager need not be selected from among the Members.

    (B)   Appointment and Removal and Resignation of Manager.  The Manager shall thereafter be elected at the applicable "Annual Meeting" of the Members as provided in Section 3.4.5 below.  The Manager may be removed at any time and from time to time at a "Special Meeting" called as provided in Section 3.4.5(B) below by the vote of a Company Majority.  Any Manager may resign at any time by giving written notice to all of the Members, and the acceptance of such resignation is not necessary to make it effective.  In the event a Manager resigns, dies or is otherwise removed, then a replacement shall be selected as provided in Section 3.4.5(G).

    (C)   Selection of Successor Manager.  Upon receipt of written notice of resignation of a Manager, or upon the death or other removal of a Manager, any Member may propose a Successor Manager, which Successor Manager shall be appointed as the Manager of the Company upon approval as provided in Section 3.4.5(G).

    3.4.2   Manager Powers.  Subject to the restrictions of Section 3.4.3 below, the Manager shall have the power and duty under the Nevada Act to direct and administer the business, activities and affairs of the Company and to develop and implement all Company policies and procedures as follows:

    (A)   The entering into of any contract, agreement, lease or other arrangement with any Person in the ordinary course of business.

    (B)   The engaging or hiring of any employee, consultant, attorneys, accountants, appraisers or other Persons on behalf of the Company.

    (C)   The opening and administration of bank accounts or accounts with other financial institutions to permit the Company to conduct its business and to make short-term investments of the Company funds pending application of such funds to the payment of Operating Expenses.

    (D)   The paying, or causing the Company to pay, all of its approved expenses as and when due.

    (E)   The determination of when Additional Assessments should be made for the purpose of meeting Operating Expenses and the amount of any such Additional Assessments.  When such determinations as to Additional Assessments are made, the Manager shall take all such acts, or shall cause the Company to take all such acts, as are required under the Operating Agreement to make the Additional Assessments as provided in Section 4.1.2 below.

    (F)   The solicitation and negotiation of offers to sell the Real Property, or any portion thereof, which offers shall be submitted to the Lenders for the approval of a Lender Majority prior to the Company's acceptance of any such offers as provided in Section 3.4.3(A) below.

    (G)   The determination of the statutory agent of the Company and the location, if any, of the principal office of the Company.

(H)    The obtaining of general liability insurance by which the Company will be insured against any damage or liability resulting from accidents or injuries occurring on the Real Property.

(I)    The managing and overseeing of any and all other aspects of the Company business and activities not otherwise referenced above but which are in the ordinary course of the Company's business and activities.

(J)    The filing of a Chapter 11 bankruptcy petition if, in the Manager's reasonable opinion, such a petition has to be filed in order to preserve the Real Property prior to seeking Member approval as set forth in Section 3.4.3(B).

3.4.3    Specific Actions Requiring Approval of Lenders or Members.

(A)    Actions Requiring the Approval of a Lender Majority.  The Company and the Manager shall only take the following acts or actions with the affirmative approval of a Lender Majority, and the Manager shall not have the power independently to take any of the following specific actions without the advance approval of a Lender Majority.  For purposes of this Agreement, a "Lender Majority" shall be the vote or affirmative approval of Lenders holding in the aggregate Percentage Interests in the Loan of fifty-one percent (51%) or more.  The following actions shall require the written approval of a Lender Majority:

(1)    The sale, exchange or other disposition of the Real Property, or any portion thereof, for cash, installment notes, other real property and/or other consideration.

(2)    The borrowing of money and the entering into of any other financing arrangement of any kind or nature and/or the granting of any security interest, mortgage, deed of trust or other security arrangement with respect to any of the assets of the Company in excess of $250,000.

(3)    The entering into of any business combination, merger, joint venture, partnership, or other similar arrangement or agreement of any nature involving the Real Property.

(4)    Commencing or defending against any legal proceeding related to the Real Property, which legal proceedings may include but not be limited to (i) a lawsuit concerning partition of the Real Property and (ii) any mechanic's liens recorded against the Real Property.

(5)    Pledging the Real Property or any other asset of the Company as collateral for a loan (irrespective of the purpose of such loan) or to secure any other obligation of the Company.

(6)    Taking any other action not expressly authorized by Section 3.4.2 above, except for those actions requiring the approval of a Company Majority.

(B)    Actions Requiring the Approval of a Company Majority.  For purposes of this Agreement, a "Company Majority" shall be the vote or affirmative approval of Members holding in the aggregate Percentage Interest in the Company of fifty-one percent (51%) or more.  Acts requiring the approval of a Company Majority shall require the approval of a Company Majority at an Annual Meeting or Special Meeting of Members or by way of a resolution of the Members adopted as provided herein by an "Action in Writing in Lieu of Meeting" (as defined in Section 3.4.6 below).  The following actions shall require the approval of a Company Majority:

(1)    The amendment or modification of this Operating Agreement or the Articles of Organization of the Company.

(2)    The election and removal of the Manager, except to the extent otherwise provided in Section 3.4.5(G).

(3)    The determination to dissolve and liquidate the Company.

(4)    Any other action which this Agreement provides shall require the approval of a Company Majority.

3.4.4    Member Meetings.

(A)    Annual Meeting.  The Company shall have an "Annual Meeting" of Members at such time and place as may be determined by the Manager.  The Manager shall give the Members who are of record at the time of the notice at least ten (10) business days written notice of the time and place of the Annual Meeting along with an agenda of items to be discussed at such Annual Meeting.

(B)    Special Meetings.  The Company shall have a "Special Meeting" of Members upon the written request (the "Special Meeting Request") to the Manager for such a Special Meeting by Members holding a Company Majority.  The Special Meeting Request shall set forth the agenda to be discussed and voted on by the Members at the Special Meeting.  The agenda may address any of the items which require approval as set forth in Section 3.4.3 above.  The Manager shall set the time and place for such Special Meeting, which shall not be later than fifteen (15) business days following the receipt by the Manager of the Special Meeting Request and which shall give reasonable notice of the Special Meeting to the Members of record at the time of the notice, and shall distribute to the Members the agenda for such Special Meeting prior to the Special Meeting Date.  Among other things, Special Meetings may be requested for the purpose of voting on the removal and replacement of the Manager.

(C)    Adjournment of Member Meetings.  If any meeting of the Members is adjourned to another time or place, no further notice as to such adjourned meeting need be given if the time and place to which it is adjourned are fixed and announced at such meeting.  In the event of a transfer of Member Interests after notice has been given and prior to the holding of the meeting, it shall not be necessary to serve notice on the transferee.  Nothing herein contained shall prevent the setting of a record date in the manner provided by law for the determination of the Members who are entitled to receive notice of or to vote at any meeting of Members or for any purpose permitted by law.

(D)    Waiver of Notice.  Notice of the time, place and purpose or purposes of any meeting of Members may be waived in writing, either before or after the holding of such meeting, by any Member.

(E)    Quorum.  At any meeting of Members the holders of Member Interests representing a Company Majority, in person or represented by proxy, shall constitute a quorum for such meeting, but no action required by law, the Articles of Organization, or this Operating Agreement requiring a Company Majority or a Lender Majority may be authorized or taken by a lesser proportion. The holders of a majority of the Percentage Interest in the Company represented at a meeting in person or by proxy may adjourn such meeting from time to time, and at such adjourned meeting any business may be transacted as if the meeting had been held as originally called.

7

(F)    Members Entitled to Vote. Every Member of record shall be entitled at each Annual Meeting or Special Meeting of Members to vote in accordance with each such Member's Percentage Interest in the Company.

(G)    Member Voting for Manager. At an Annual Meeting, or at a Special Meeting (in the event the Manager has resigned, has died or has been removed), the Person receiving the greatest number of votes shall be the Manager. Such election of the Manager may be by ballot or viva voce, as the holders of a majority of the Percentage Interest in the Company represented at the meeting in person or by proxy may determine.

(H)    Proxies. At meetings of the Members, any Member of record entitled to vote thereat may be represented and may vote by a proxy or proxies appointed by an instrument in writing, but such instrument shall be filed with the Manager before the person holding such proxy shall be allowed to vote thereunder. No proxy shall be valid after the expiration of six (6) months after the date of its execution, unless coupled with an interest or the Member executing it shall have specified therein the length of time it is to continue in force, which in no case shall exceed seven (7) years from the date of its execution.

(I)    Order of Business and Procedure. The order of business at all meetings of the Members and all matters relating to the manner of conducting the meeting shall be determined by the Manager, whose decisions may be overruled only by a vote of the holders of a majority of the Percentage Interest in the Company represented at such meeting in person or by proxy. Meetings shall be conducted in a manner designed to accomplish the business of the meeting in a prompt and orderly fashion and to be fair and equitable to all Members, but it shall not be necessary to follow any manual of parliamentary procedure.

(J)    Telephonic and Video Conference Meetings. Members may hold and participate in a meeting by means of telephonic conference network, video conference network or similar communications method by which all persons participating in the meeting can hear each other. Participation in a meeting pursuant to this Section constitutes presence in person at such meeting and shall be reported as such in the minutes thereof. The minutes may be signed in counterparts.

3.4.6    Records of Meetings, Etc. At each Annual Meeting of Members and at each Special Meeting of Members, a recording secretary (who shall be one of the Members) shall be appointed who shall prepare the minutes of the meeting and shall certify the resolutions adopted or actions taken at any such meeting by the Manager or by the Members. In lieu of a meeting, the Manager or the Members may cause the Company to take action or may authorize any act or omission by the Company by executing and delivering an action in writing in lieu of a meeting (an "Action in Writing in Lieu of Meeting" or "Action in Writing"); provided, however, that any such "Action in Writing" shall be executed by a Lender Majority or a Company Majority, as applicable, if the Members are taking any action; and further provided that such Actions in Writing in Lieu of Meeting shall require the signature of a greater number of Members, if required by the laws of the State of Nevada that may not be altered by the agreement of the Members as set forth herein. Any such Action in Writing may be executed in counterparts and may be delivered by facsimile or electronic transmission. Any action requiring the affirmative approval of the Members may be submitted to the Lenders or Members, as the case may be, in writing, together with a ballot in a form reasonably acceptable to the Manager, and the executed ballots from a Lender Majority or a Company Majority, as applicable, in favor of or opposed to an option presented by the ballot shall constitute an "Action in Writing in Lieu of Meeting". All minutes, resolutions and actions in writing of the Members shall be permanently maintained as part of the books and records of the Company and shall be available for inspection, review and copying by any Member at reasonable times and place upon such Member giving reasonable notice to the Manager.

3.4.7    <u>Signature Authority</u>.  Except as this Agreement or the resolutions of the Members shall provide otherwise, any document, contract, agreement, return or other legal instrument of the Company shall be signed by the Manager and shall be binding on the Company. The Company may open such bank account or accounts as the Manager shall determine.  No person shall be required to inquire as to the power of the Manager to execute any item as provided in this Section 3.4.7 and any person may rely upon the signature of the Manager on any document of the Company as provided herein.

3.4.8    <u>Compensation of Manager</u>.  The Manager shall be entitled to reasonable compensation on a periodic basis for services provided as Manager to the Company, whether such services are provided by the Manager or by a manager, employee, officer, beneficial owner or designee of the Manager which is a limited liability company or other legal entity.  The Company shall pay the Manager a minimum of $_____ per month (the "Minimum Compensation") for services provided to the Company.   In the event the Manager requests compensation above the Minimum Compensation, the Manager shall provide an invoice to the Company on a monthly basis for the services performed by the Manager (or its manager, employee, officer, beneficial owner or designee if a Manager is a limited liability company or other legal entity) during the previous month.   Any request for compensation above the Minimum Compensation shall include a reasonable description of the time spent and the services performed.  Such Manager invoices shall be maintained following payment as part of the books and records of the Company.

3.4.9    <u>Information Regarding Members</u>.  The Manager shall maintain as part of the business records of the Company a list (the "Member List") of all of the Members including the name, address, telephone number, facsimile number (if applicable) and e-mail address (if available) of each Member and each Non-Participating Lender.  Upon receipt of a written request, the Manager shall make available to any Member the then current Member List.  Each Member agrees to provide the Manager with information regarding any change in the information appearing on the Member List with respect to such Member and each such Non-Participating Lender.

Section 3.5    <u>Other Business Interests; Etc.; No Obligation To Make Business or Investment Opportunities Available to Company</u>.  Each Member and any Manager may have other business and investment interests and may engage in any other business, investment trade, or employment and shall not be obligated to devote more time and attention to the conduct of the business of the Company than shall be required for the supervision of the operation and management of the Company's business and affairs in the ordinary course.  The Members acknowledge and agree that the activities of the Manager on behalf of the Company shall be on a part-time basis and that the Manager is employed or otherwise engaged on a full time basis in other activities.  No Member and no Manager shall have any obligation of any nature to make available to the Company or to any other Member any business opportunity, investment opportunity, limited liability company opportunity or corporate opportunity of any nature, and neither the Company nor any Member or Manager shall have any claim of any nature against any other Member or any Manager for failure to make available any business opportunity, investment opportunity, limited liability company opportunity or corporate opportunity to the Company or such Member.

ARTICLE IV
CAPITAL; MEMBER LOANS

Section 4.1    <u>Initial Capital Contributions; Additional Assessments</u>.

4.1.1    <u>Initial Capital Contributions</u>.  By way of the execution and delivery of this Agreement, each Member hereby contributes his, her or its Lender's Investment Interest to the Company. Such Contributions shall constitute each Member's Initial Capital Contribution to the Company.  The amount

of each Member's Contribution shall be the Initial Capital Contribution (i.e., the "Contributions" as defined in Paragraph E of the Recitals above) to the Company which shall be recorded on Exhibit D.

      4.1.2   Additional Assessments.

      (A)   Procedure For Additional Assessments. The Manager shall have the right to assess each Member, proportionate to each such Member's Percentage Interest in the Company as set forth on Exhibit D, for additional Capital Contributions (the "Additional Assessments") to the Company for the purpose of meeting the Company's "Operating Expenses" (as defined below) until such time as the Real Property is sold, exchanged or otherwise disposed of and the Company is completely dissolved and liquidated. All Additional Assessments shall be deemed to be loans to the Company, shall accrue simple interest at a rate of _____ percent (___%) per year (the "Default Rate"), and shall be repaid as provided in Sections 5.2.2 and 8.2, below. The Manager shall give written notice (the "Assessment Notice") to the Members of each Additional Assessment, which Assessment Notice shall include (1) a summary of the projected Operating Expenses to be paid with the funds to be provided by the Additional Assessments, (2) the total amount of the Additional Assessment required from all Members, (3) the amount of the Additional Assessment to be made by each specific Member, based on each Member's Percentage Interest in the Company, and (4) the date by which the Additional Assessment is to be made by the Members, which date shall not be earlier than twenty (20) business days after the receipt of the Assessment Notice. The Manager may make such Additional Assessments on as many occasions as may be necessary to meet and pay the Operating Expenses of the Company. The Manager shall only make Additional Assessments for the sole and express purpose of meeting the Operating Expenses and the Manager shall not make Additional Assessments for any other purpose. All monies previously contributed to the Company by Lenders pursuant to one or more assessments shall be deemed to be Additional Assessments on the books of the Company.

      (B)   Definition of Operating Expenses. The "Operating Expenses" which the Company shall pay with the funds from any "Additional Assessments" may include the following, as determined by the Manager: (a) the expenses of the organization and formation of the Company; (b) annual expenses necessary under state law to maintain the Company's status as a limited liability company or to maintain the Company's qualification in a State where it does business; (c) property taxes and related property charges or assessments imposed by any government, governmental agency or sub-division thereof; (d) all expenses of any attorneys, accountants, appraisers or other consultants engaged by the Company including, without limitation, all expenses of preparing and distributing the Company's annual federal and state income tax returns and schedules thereto and all expenses of preparing the Company's annual reports to Members; (e) all compensation payable to the Manager for the services of the Manager to the Company; (f) all mailing, postage and common carrier expenses, all telephone, facsimile or internet service charges and all copying expenses and charges relating to the Company's business or activities; (g) all rental expenses and related expenses for renting space for any annual or special meeting of the Company or for any other meeting of Members; (h) all expenses and costs incurred in indemnifying the Manager as provided in Article X; (i) all expenses and costs incurred in stabilizing and maintaining the Real Property and complying with such requirements as may be imposed by law, until such time as the Real Property can be sold; (j) all loans from persons or entities that are not Lenders ("Third Party Loans") relating to the Company's business or activities; and (k) all other reasonable expenses and charges which are directly related to or attributable to the Company's business, activities or investment in the Real Property.

      (C)   Third Party Loans; Deficiency Amounts; Cover Loans.

      (I)   In General. Funds to meet Operating Expenses may be obtained from Third Party Loans, Additional Assessments and/or Cover Loans. If any Member (the "Defaulting Member") fails to pay the amount (in the singular the "Deficiency Amount" and collectively the "Deficiency Amounts") due from such Member pursuant to one or more Additional Assessments, then any other Member and/or

Non-Participating Lender may offer to make a loan (the "Cover Loan") to the Company, or the Manager may solicit Cover Loans from the Members who are not Defaulting Members and/or from the Non-Participating Lenders, to provide funds to meet Operating Expenses when a shortfall exists because of Deficiency Amounts. Any Cover Loan shall accrue simple interest at the Default Rate and shall be repaid as provided in Sections 5.2.2 and 8.2, below. The proceeds of all Third Party Loans and Cover Loans shall be used to meet Operating Expenses. To the extent that more Members or Non-Participating Lenders (the "Covering Persons") want to provide Cover Loans than is necessary to meet the Deficiency Amounts, then the Manager shall pro-rate the right to make such Cover Loans among the Covering Persons pro-rata to the respective Percentage Interest in the Loan of the Covering Persons who desire to make the Cover Loans.

        (D)    <u>Records of Operating Expenses, Additional Assessments and Cover Loans</u>. The Manager shall cause the Company to maintain accurate and complete records of all Operating Expenses, Third Party Loans, Additional Assessments and Cover Loans.

        Section 4.2    <u>Capital Accounts – In General; Adjustments to Capital Accounts</u>.

        4.2.1    <u>In General</u>. A single Capital Account ("Capital Account") shall be established, determined and maintained for each Member on the books and records of the Company in accordance with the provisions of the Allocation Regulations governing the determination and maintenance of partnership capital accounts. Consistent with the Allocation Regulations, the following rules shall govern the determination and maintenance of Capital Accounts:

        (A)    A Member's Capital Account shall be credited with (i) the amount of such Member's Initial Capital Contribution as set forth above, (ii) the fair market value of any other property or other assets contributed by such Member to the Company in accordance with the terms of this Agreement (net of liabilities secured by such contributed property or assets that the Company is considered to assume or take subject to under Section 752 of the Code), (iii) such Member's distributive share of Profits (or items thereof) and (iv) the amount of any of the Company's liabilities which the Member assumes in the future; and

        (B)    A Member's Capital Account shall be debited with (i) the amount of money distributed to such Member, (ii) the fair market value of property or other assets distributed to such Member (net of liabilities secured by such distributed property or assets that such Member is considered to assume or take subject to under Section 752 of the Code), (iii) such Member's distributive share of Losses (or items thereof) and (iv) the amount of any liabilities of the Member assumed by the Company in the future.

Additional Assessments and Cover Loans paid to the Company shall be deemed to be loans to the Company and shall not be considered as Capital Contributions to the Company. A Member's Capital Account shall reflect all Member Interests in the Company owned by such Member.

        4.2.2    <u>Transfers of Interests</u>. Upon a Transfer of all or a part of an interest in the Company, the Capital Account of the transferor shall carry over to the transferee, provided that if such Transfer causes a termination of the Company under Section 708(b)(1)(B) of the Code, the Capital Account that carries over shall be appropriately adjusted to reflect the liquidating distribution and the contributions deemed to have occurred under Section 1.708-1(b)(1)(iv) of the Income Tax Regulations. Except as required by the Allocation Regulations, any Member with respect to whom a Company election to make an optional adjustment to the basis of property or other assets of the Company under Sections 734 and 743 of the Code is in effect (as a result of an election under Section 754 of the Code) shall not have a corresponding adjustment made to such Member's Capital Account, and any adjustments to such Member's Capital Account by reason of distributions, depreciation, depletion, amortization, gain or loss with respect to such property or other assets will disregard such basis adjustment.

4.2.3    No Interest on Capital Contributions; No Right to Withdraw Capital; No Liability for Failure to Return Capital Contribution.    No interest shall be paid by the Company to any Member with respect to any Capital Contribution.  Except as otherwise specifically set forth in this Agreement, no Member shall have the right to (a) demand or receive property other than cash in return for its Capital Contribution or as distributions of income; (b) withdraw any part of its Capital Contribution (regardless of whether or not such Member has withdrawn from the Company); or (c) receive any property or other assets of the Company.

4.2.4    Interpretation.    The provisions of Section 4.2 are intended to comply with the Allocation Regulations and shall be interpreted in a manner consistent with such regulations.  If any of the provisions of this Agreement relating directly or indirectly to Capital Account determination and maintenance at any time conflict with the Allocation Regulations, the Allocation Regulations shall govern Capital Account determination and maintenance.

ARTICLE V
ALLOCATIONS AND DISTRIBUTIONS OF CASH FLOW

Section 5.1    Allocations of Profits and Losses.    Profits and Losses shall be allocated among the Members and Non-Participating Lenders as hereinafter provided. Profits and Losses shall be allocated among the Members in accordance with each Member's Percentage Interest in the Loan, and the Manager shall cause the Company to make allocations and distributions as set forth in this Article V.

Section 5.2    Distributions or Application of Cash Flow.    Cash Flow generated from the operations of the Company shall be applied by the Company, to the extent available, in the following order of priority:

5.2.1    Distributions for Taxes. To make distributions to Members to permit them to pay federal and state income taxes attributable to the Profits of the Company on the assumption that each Member is in the maximum federal tax bracket for individuals and each Member pays state income taxes at a 6% rate. Such distributions are mandatory to the extent of Cash Flow, and shall be made not later than 90 days after the end of the year of the Company in which taxable income arises; provided, however, if the Company's Profits are projected to exceed $50,000 in a calendar year the Manager shall consider in good faith whether the Company should make quarterly distributions based on projected Profits to assist Members in meeting quarterly estimated tax obligations with such adjustments in a final distribution not later than 90 days after the end of the year to reflect actual Profits of the Company for such year.

5.2.2    Application of Cash Flow to Pay Cover Loans and Additional Assessments.  After distributions for taxes as provided in Section 5.2.1 have been made or adequately provided for, Cash Flow shall be applied on a pro-rata basis as follows:

(a)    First, to pay any Third Party Loans and all accrued interest thereon;

(b)    Second, to pay any other outstanding Operating Expenses of the Company;

(c)    Third, to pay the principal amount of all Cover Loans and all accrued interest thereon at the Default Rate as provided above;

(d)    Fourth, to pay the principal amount of all Additional Assessments and all accrued interest thereon at the Default Rate as provided above;

   (e)  Finally (and only after payment in full of items (a) through (d) above), to the Lenders in proportion to their respective Percentage Interest in the Loan.

The Manager shall have the right to cause the Company to retain any Cash Flow otherwise available for distribution to a Member and not make such distributions until and unless such Member executes in a form reasonably satisfactory to the Manager a written confirmation of, or consent to, the transfer to the Company of the Lender's Investment Interest of such Member (and/or unless any such Member who has previously failed to confirm or consent to such transfer provides such other documentation in a form reasonably satisfactory to the Manager confirming or establishing a transfer to the Company of such Lender's Investment Interest).

   Section 5.3  <u>Distributions and Allocations in Respect of Transferred Member Interests</u>.  If any Member Interest (or portion thereof) is transferred during any accounting period, Profits, Losses, each item thereof and all other items attributable to such Member Interest (or portion thereof) for such period shall be allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Section 706(d) of the Code, using any conventions permitted by law and selected by the Manager.  Unless otherwise determined by the Manager, all distributions made on or before the last day of the calendar month in which the Company received written notice of such Transfer shall be made to the transferor, and all distributions made thereafter shall be made to the transferee.  Solely for purposes of making such allocations and distributions, the Company shall recognize such transfer not later than the end of the calendar month during which it is first given notice of such transfer.

   Section 5.4  <u>Certain Provisions of the Nevada Act Superseded</u>.  The provisions of this Agreement regarding allocations and distributions among the Members are intended to and shall, to the fullest extent permitted by law, supersede the provisions of the Nevada Act regarding allocations and distributions.

ARTICLE VI<br>BOOKS AND RECORDS; TAX MATTERS; REPORTS

   Section 6.1  <u>Books and Records</u>.  The Company shall maintain its books and records, including the books and records required by §86.241 of the Nevada Act, at the office identified in Section 2.2.  The Manager shall cause the Company to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect transactions and dispositions of assets of the Company and shall devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that (a) transactions have been and are executed in accordance with the general or specific authorization of the Manager; (b) transactions have been and are recorded as necessary (i) to permit preparation of financial statements in conformity with this Agreement, and (ii) to maintain accountability for assets; (c) access to assets has been and is permitted only in accordance with the general or specific authorization of the Manager; and (d) the recorded accountability for assets has been and is compared with the existing assets at reasonable intervals and appropriate action has been and is taken with respect to any difference.

   Section 6.2  <u>Fiscal Year; Accounting Method; Independent Accountant Review</u>.  The fiscal year of the Company shall be the year ending December 31st.  The method of accounting used by the Company for book and tax purposes shall be the "cash method" unless the Manager determines that the financial statements of the Company shall be prepared in accordance with generally accepted United States accounting principles ("GAAP") consistently applied in which case the method of accounting used by the Company shall be the "accrual method" or under some other method.  The Manager shall determine each year whether the Company's financial statements shall be certified (in which case an accrual method of accounting shall be used) or shall be subject to a review, compilation or other level of review by an independent public

13

accounting firm. Unless the Manager determines that the Company's books are to be subject to an independent audit, the Company shall prepare its books and records on the "cash basis" of accounting which the Company uses for income tax purposes.

Section 6.3    Tax Elections.  Without the advance written consent of a Company Majority, the Company shall not make any election pursuant to Section 754 of the Code to adjust the basis of the property and other assets of the Company for transfers of Member Interests.  The Manager may, in its reasonable discretion, make any other tax elections on behalf of the Company.

Section 6.4    Tax Returns.  The Manager shall cause the Company to prepare and file on a timely basis all necessary federal, state and local tax returns of the Company.  Each Member shall furnish all relevant information in his possession relating to the Company that is necessary to enable the Company's tax returns to be prepared and filed.  The Manager shall cause K-1s and other tax return information or reports to be timely made available to Members.

Section 6.5    Tax Matters.  The Manager shall inform each Member of all significant matters that may come to its attention by giving notice thereof on or before the fifth business day after becoming aware thereof and, within that time, shall forward to each Member copies of all significant written communications it may receive in that capacity.  The Manager may take any action contemplated by Sections 6222 through 6232 of the Code to be taken by the Manager, but shall not take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Code.

Section 6.6    Reports to the Members.

6.6.1    The Manager shall cause the Company to prepare and distribute to each Member, on or before March 31 of each fiscal year, the Member's Schedule K-1 (Form 1065) and all other information reasonably necessary for the preparation of such Member's federal, state and local tax returns.

6.6.2    The Manager shall cause the Company to prepare financial statements of the Company as of the end of each fiscal year for purposes of determining Profits and Losses, and the corresponding adjustments to Capital Accounts reflecting Profits and Losses.  Such financial statements shall include, at least, a balance sheet, a statement of Members' equity as of the end of each fiscal year and statements of the results of operation and cash flows.  The financial statements contemplated by this Section 6.6.2 shall be prepared in accordance with the cash method of accounting used by the Company for tax purposes, or in accordance with such other accounting principles or conventions as the Manager shall determine.  The Manager shall determine on an annual basis whether such financial statements shall be audited, reviewed, compiled or otherwise examined by a certified public accountant.  The Manager shall cause the Company to distribute such financial statements of the Company to the Members with respect to a fiscal year at the same time that Schedule K-1 (Form 1065) is being distributed to the Members for such fiscal year.

ARTICLE VII
TRANSFER OF MEMBER INTERESTS; CONDITIONS TO TRANSFER;
ABANDONMENT OF MEMBER INTERESTS

Section 7.1    Restrictions on Transfers.  A Member may sell, transfer, assign, pledge, encumber, hypothecate, or otherwise dispose of all or any portion of the Member Interest owned by such Member, provided that any transferee of any Member agrees in advance of any transfer in a form reasonably satisfactory to the Manager to become a Member and to otherwise be bound by all of the terms and conditions of this Agreement.  Any Person that is a transferee of a Member and agrees to be bound as a

14

Member by all of the terms and conditions of this Agreement shall be a "Substitute Member" and shall have all of the rights, privileges, duties and obligations as a Member as such Substitute Member's transferor.

Section 7.2    Additional Restrictions.    Notwithstanding anything in this Agreement to the contrary, the following additional restrictions apply to the Member Interests:

7.2.1    No Member shall make any transfer of any Member Interests if the transfer would, when considered with all other transfers during the same applicable twelve-month period, cause a termination of the Company for federal income tax purposes.

7.2.2    No Member shall make any transfer of any Member Interests to a minor or to an incompetent; except that a transfer may be made to a trustee, custodian or guardian for the benefit of a minor or an incompetent, if such transfer is effected in accordance with applicable law.

7.2.3    The Manager may require, in addition to any other reasonable requirements that may be imposed, as a condition to the transfer of any Member Interests, that the transferring Member and/or transferee (i) assume all costs incurred by the Company in connection therewith; and (ii) furnish reasonable assurances to the Members, including the provision of any factual information and/or legal opinions satisfactory in all respects to the Members, that such transfer complies in all respects with applicable federal and state securities laws.

Section 7.3    Transferee Who is Not Admitted as a Member.    A transferee of Member Interests who does not become a Substitute Member as provided in this Article VII and who desires to make a further transfer of Member Interests shall be subject to all the provisions of this Article VII to the same extent and in the same manner as any Member desiring to make a transfer of Member Interests.    A transferee of Member Interests who does not become a Substitute Member shall not have any of the rights of a Member and shall be entitled to receive, only to the extent assigned, the distributions of cash, property and other assets and the allocations of profits, losses, income, gains, deductions, credits and similar items to which the transferee's transferring Member would have been entitled.    No transfer shall relieve any transferor of his or its obligations under this Agreement.

Section 7.4    Member Who Transfers All of Its Member Interests to Company or Substitute Member.    A Member who transfers all of its Member Interests to the Company and/or to one or more persons who are admitted as Substitute Members of the Company shall be deemed to have withdrawn from the Company, shall cease to be a Member of the Company and shall no longer have any of the rights or privileges of a Member.

Section 7.5    Violative Transfers.    Any attempted or purported transfer and any attempted or purported purchase or other acquisition of Member Interests in violation of this Agreement shall be null and void and shall constitute a fraud upon the Company and the Members.    Any such attempted or purported transfer or purchase or other acquisition may be enjoined in any court of competent jurisdiction by any Member or by the Company.    The person making the attempted or purported transfer, notwithstanding any agreement or understanding with any such attempted or purported transferee, shall retain all rights and obligations it had with respect to the Member Interests immediately prior to the attempted or purported transfer.

Section 7.6    Certain Provisions of the Nevada Act Superseded.    The provisions of this Agreement regarding the transfer of Member Interests and the withdrawal of a Member are intended to and shall, to the fullest extent permitted by law, supersede the provisions of the Nevada Act regarding the withdrawal of a member.

Section 7.7    Restrictions Reasonable.  The parties to this Agreement agree and acknowledge that the restrictions on transfer of Member Interests imposed by this Agreement are reasonable and are imposed to accomplish legitimate purposes of the Members and the Company, and that such restrictions are not more restrictive than necessary to accomplish those purposes.

Section 7.8    Abandonment of Member Interests.  A Member may at any time voluntarily withdraw as a Member of the Company by abandoning his, her or its Member Interest, provided, however, that a member who abandons such a Member Interest shall also be deemed to have abandoned his, her or its Percentage Interest in the Loan.  Such abandonment shall be accomplished by the applicable Member giving written notice of abandonment and a quit claim deed to the Manager indicating that the Member is withdrawing from the Company, is abandoning his, her or its Member Interest and intends to have no further interest of any nature in the Company, the Real Property, any other assets of the Company and the Company's Profits, Losses, gains, credits or deductions.  Upon a Member abandoning a Member Interest, (a) the Percentage Interest in the Company and Capital Accounts of all remaining Members shall be increased by the amount of the Percentage Interest in the Company and Capital Account of the Member abandoning a Member Interest in proportion to the outstanding Percentage Interest in the Company of the remaining Members and the Manager shall revise Exhibit A to reflect such increase; and (b) the Percentage Interest in the Loan, as adjusted, of all remaining Lenders shall be increased by the amount of the Percentage Interest in the Loan, as adjusted, of the Member abandoning a Member Interest in proportion to the outstanding Percentage Interests in the Loan of the remaining Lenders and the Manager shall revise Exhibit D to reflect such increase.

Section 7.9    Securities Law Restrictions.  In addition to any restrictions on the transferability of any Membership Interest, each of the Members expressly acknowledge that the Membership Interests have not been registered under the Securities Act of 1933 (the "1933 Act"), or applicable state securities laws.  Each Member understands that the Membership Interests have been issued in reliance on an applicable exemption from registration under the 1933 Act.  Each Member represents and warrants that (i) their Membership Interest is being acquired solely for his, her or its own account, for investment purposes only, and is not for distribution, subdivision or fractionalization thereof; and (ii) other than as disclosed herein, he, she or it has no agreement or other arrangement, formal or informal, with any person to sell, transfer or pledge any part of the Membership Interest, or which would guarantee to it any profit, or protect it against any loss, with respect to the Membership Interest and he, she or it has no plans to enter into any such agreement or arrangement.  Each Member further understands that he, she or it must bear the economic risk of the investment in the Membership Interest for an indefinite period of time.

ARTICLE VIII
DISSOLUTION, LIQUIDATION AND TERMINATION

Section 8.1    Dissolution.  The Company shall be dissolved and its business and affairs wound up on the first to occur of the following:

8.1.1    The written consent of a Company Majority to dissolve and liquidate the Company; or

8.1.2    The withdrawal of all Members from the Company by the abandonment by all Members of their Member Interests in the Company; or

8.1.3    Any other event under the laws of the State of Nevada which requires the dissolution and liquidation of the Company.  The consequences of any dissolution of the Company shall be as set forth below in this Article VIII.

16

Section 8.2    <u>Liquidation and Termination</u>. On dissolution of the Company, the Manager shall act as a liquidator or may appoint one or more other Persons to act as liquidator. The liquidator shall proceed diligently to wind up the business and affairs of the Company and make final distributions as provided in this Agreement. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the property and other assets of the Company with all of the power and authority of the Manager and Members. A reasonable time shall be allowed for the orderly liquidation of the property and other assets of the Company and the discharge of its liabilities to creditors so as to enable the liquidator to minimize any losses resulting from liquidation. The liquidator, as promptly as possible after dissolution and again after final liquidation, shall cause a proper accounting to be made of the Company's property and other assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable, and shall apply the proceeds of liquidation in the same manner and priority as the distribution and application of Cash Flow as set forth in Section 5.2 above.

Section 8.3    <u>Reserve</u>. Notwithstanding the provisions of this Article VIII, the liquidator may retain such amount as it deems necessary as a reserve for any contingent liabilities or obligations of the Company, which reserve, after the passage of a reasonable period of time, shall be distributed pursuant to the provisions of this Article VIII.

Section 8.4    <u>Final Accounting</u>. Each of the Members shall be furnished with a statement which shall set forth the assets and liabilities of the Company as of the date of the complete liquidation. Upon the compliance by the liquidator with the foregoing distribution plan, the liquidator shall execute and cause to be filed a Certificate of Dissolution and any and all other documents necessary with respect to termination and cancellation of the Company under the Nevada Act.

ARTICLE IX
AMENDMENTS

The Members shall amend this Agreement and the Articles only with the advance written approval of a Company Majority.

ARTICLE X
INDEMNITY AND EXCULPATION PROVISIONS
MANAGER AND OFFICERS

Section 10.1    <u>In General</u>. Each Person who is acting on behalf of the Company as a Manager or officer of the Company including specifically any manager, officer, employee, beneficial owner or designee of a Manager of the Company which is a limited liability company or other legal entity who is performing services on behalf of such Manager for the benefit of the Company (collectively all such Persons are hereinafter referred to as "Indemnified Persons" and in the singular as an "Indemnified Person") shall have no liability whatsoever of any nature to the Company and/or to its direct or indirect members or beneficial owners for any negligence, gross negligence, mistakes or errors in judgment or for any act or omission undertaken, or omitted to be undertaken, by any such Indemnified Person with respect to the Company regardless of the nature of the negligence, gross negligence, mistake, error in judgment or act or omission; provided, however, that the foregoing shall not apply and each such Indemnified Person may be liable to the Company and its Members for acts or omissions taken or omitted by such Indemnified Person in connection with his, her or its duties as a Manager or officer, or his or her duties as a manager, officer, employee, beneficial owner or designee of any Manager which is a limited liability company or other legal entity, as the case may be, resulting in a detriment to the Company if such acts or omissions are intentional wrongdoing, willful misconduct or other acts or omissions which comprise a

17

felony under the laws of the State of Nevada, whether or not the Manager or officer or other Indemnified Person is convicted of, or pleads nolo contendere to, any such felony.

Section 10.2    <u>Nature of Exculpation From Liability</u>.  This exculpation from liability for all acts and omissions as set forth in Section 10.1 above other than those involving acts or omissions which comprise intentional wrongdoing, willful misconduct or other acts or omissions which comprise a felony under the laws of the State of Nevada is to be absolute and unconditional.  The fact that a Manager or officer, or any manager, officer, employee, beneficial owner, or designee of any Manager which is a limited liability company or other legal entity, has obtained the advice of legal counsel for the Company that any act or omission is within the scope of the authority conferred upon them by the Articles and this Operating Agreement shall be conclusive evidence that such person believed in good faith such act or omission to be within the scope of the authority and any act or omission taken upon the advice of legal counsel to the Company shall result in the Manager or officer or such other Indemnified Person having no liability to the Company or its Members, but a Manager or officer or other Indemnified Person shall not be required to procure such advice to be entitled to the benefits of the preceding sentence.  The provisions of this Article X relating to exculpation extend, without limitation, to any and all determinations of the Manager or officer or other Indemnified Persons to cause the Company to hold assets, to sell any such assets, to lease property, to engage a valuation expert, to invest or reinvestment any proceeds from the sale of any asset and the selection, retention or termination of any investment the Manager or other person engaged to invest, or to assist in investing, the assets of the Company.

Section 10.3    <u>Expenses</u>.  The Manager or officer or other Indemnified Person who was or is a party to, or is threatened to be made a party to, or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he, she, or a Person of whom he or she is the legal representative (including any manager, officer, employee, beneficial owner or designee of any Manager which is a limited liability company or other legal entity), is or was a Manager or officer of the Company, or is or was serving as a Manager of the Company by the vote of the Members or as an employee of the Company at the request of the Manager, shall be indemnified and held harmless against all expenses, liability and loss (including attorneys' fees, judgments, fines and amounts paid or to be paid in settlement) reasonably incurred or suffered by him in connection therewith; provided, however this Section 10.3 shall not include claims for which such Person is not exculpated from liability under the standards set forth in Section 10.1, as applicable (i.e., there shall be no indemnification for any act which has caused detriment to the Company and which involves an act or omission comprising intentional wrongdoing, willful misconduct or other acts or omissions which comprise a felony under the laws of the State of Nevada).  Such right of indemnification shall be a contract right which may be enforced in any manner desired by such Person.  Such right of indemnification shall not be exclusive of any other right which such Manager or officers or other Indemnified Persons may have or hereafter acquire, and, without limiting the generality of such statement, they shall be entitled to their respective rights of indemnification under any by-law, agreement, vote of Members, provisions of law, or otherwise, as well as their rights under this Article.

Section 10.4    <u>Scope of Protection</u>.  The provisions of this Article X are specifically intended to provide a greater degree of protection than would be provided by the express provisions of Nevada law.  These provisions are to be respected in all events to the extent legally permissible and shall be limited or reduced only to the extent, if at all, as may be necessary to preserve the scope of exculpation and indemnity to the maximum extent permitted contractually or otherwise under the laws of the State of Nevada.

Section 10.5    <u>Insurance</u>.  Without limiting the application of the foregoing, the Manager may cause the Company to purchase and maintain insurance on behalf of any Person who is or was a Member, Manager or officer of the Company, or who was or is serving as a manager, employee, officer, beneficial owner or designee of any limited liability company or other legal entity acting as a Manager against any

liability asserted against such Person and incurred in any such capacity or arising out of such status, whether or not the Company would have the power to indemnify such Person.

Section 10.6    Continuation of Indemnification; Amendment. The indemnification and exculpation provided in this Article X shall continue as to a person who has ceased to be a Manager or officer, or who has ceased to be a manager, officer, employee, beneficial owner or designee of any current or previous Manager which is or was a limited liability company or other legal entity serving as a Manager of the Company, and shall inure to the benefit of the heirs, executors, administrators or other successors of any such Person.

Section 10.7    Limitation of Company's Obligation to Indemnify.  Nothing contained herein shall be deemed to constitute a release of Manager, nor shall the Company be obligated to indemnify Manager, for any acts or omissions taken or made on behalf of the Company or the Members without the express approval of a Company Majority.

ARTICLE XI
MISCELLANEOUS PROVISIONS

Section 11.1    No Third Party Beneficiaries.  Except for the benefits provided in this Agreement for the Non-Participating Lenders, this Agreement is entered into among the Members for the exclusive benefit of the Company, its Members, and their successors and permitted assignees.  This Agreement is expressly not intended for the benefit of any creditor of the Company or any other person.  Except and only to the extent provided by applicable law, no creditor or third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

Section 11.2    Notices.  All notices and other communications required or permitted under this Agreement shall be in writing and shall be mailed by certified mail, overnight mail, or otherwise delivered by hand or by messenger, addressed (a) if to a Member, at such address as set forth on the Member List maintained by the Company, or (b) if to the Company, at its principal office and addressed to the attention of the Manager of the Company or at such other address as the Company shall have furnished to the Members in writing.

Section 11.3    Further Assurances.  The parties shall execute and deliver such other instruments and take such other action as may be necessary or convenient to effectuate the provisions of this Agreement.

Section 11.4    Equitable Relief.  The parties acknowledge that it is impossible to measure in money the damages that would result by reason of a party's breach.  It is therefore agreed that the provisions of this Agreement shall be enforceable by injunction, specific performance or other equitable relief, without reference to whether or not an adequate remedy at law may be available.

Section 11.5    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada applicable to contracts executed and to be performed in the State of Nevada.  Any action relating to this Agreement or the rights or obligations of the Members shall be brought in the District Courts in Clark County in the State of Nevada or, if there is exclusive Federal jurisdiction, in the United States District Court for the State of Nevada.

Section 11.6    Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect any other provision hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

Section 11.7    Heirs and Successors.  This Agreement shall inure to the benefit of and be binding upon the respective heirs, personal representatives, successors and permitted assigns of the parties hereto.

19

Section 11.8    Entire Agreement.  This Agreement, the Articles, and those other agreements and instruments referenced herein constitute the entire and exclusive statement of the parties' agreement and supersede all prior agreements, understandings, negotiations and discussions among the parties, whether oral or written, with respect to the subject matter contained herein.

Section 11.9    Section Headings and Pronouns.  The section headings in this Agreement are provided for convenience only and shall be disregarded in the interpretation of this Agreement.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or persons may require.

Section 11.10    Counterparts.  This Agreement and any amendment hereto may be executed in one or more counterparts (including counterparts executed and then delivered by facsimile transmission) each of which shall be deemed to be a duplicate original, but all counterparts taken together shall constitute one and the same agreement.

Section 11.11    Definitions.

Additional Assessments has the meaning set forth in Section 4.1.2(A) above.

Agreement means this Operating Agreement of _____, LLC, as the same may be amended, from time to time.

Allocation Regulations means the Income Tax Regulations promulgated under Code Section 704(b) (regarding members' distributive shares of membership tax items), as currently in effect, and as modified and clarified by amendment, successor regulation, ruling, court decision or other Income Tax Regulation relating to members' distributive shares.

Annual Meeting has the meaning set forth in Section 3.4.5(A) above.

Articles or Articles of Organization means the Articles of Organization of the Company filed in the office of the Secretary of State of the State of Nevada upon execution of this Agreement as required by §86.201 of the Nevada Act, as amended from time to time.

Assessment Notice has the meaning set forth in Section 4.1.2(A) above.

Borrower has the meaning set forth in Paragraph A of the Recitals.

Capital Account has the meaning specified in Section 4.2.

Capital Contribution means the total amount of cash and/or property contributed to the Company by each Member, plus any other contributions to the capital of the Company made by a Member, in his capacity as a Member, pursuant to the terms of this Agreement.  Any reference in this Agreement to the Capital Contribution of a Member shall include a Capital Contribution previously made by any predecessor Member with respect to the Member Interests owned by a Substitute Member.

Cash Flow means, with respect to any fiscal year or other fiscal period, the excess of (A) Cash Receipts, over (B) the sum of Cash Disbursements during such period.

Cash Receipts means, with respect to any fiscal year or other fiscal period, the sum of (X) the total of all cash received by the Company from all operations and transactions of the Company in the ordinary course of business, plus (Y) the proceeds received from the sale of the Real Property or any of it,

plus (Z) the proceeds of any financings (not including Cover Loans).  Cash Receipts does not include any funds contributed to the Company as the initial Capital Contribution or as Additional Assessments.

Cash Disbursements means, with respect to any fiscal year or other fiscal period, all payments made by the Company of the Operating Expenses.

Code means the Internal Revenue Code of 1986, as amended, or the corresponding provisions of any subsequent federal income tax law.

Company means _____, LLC, a Nevada limited liability company.

Company Majority means Members holding Member Interests reflecting Percentage Interest in the Company of fifty-one percent (51%) or more as provided in Section 3.4.3(B) above.

Contributions has the meaning set forth in Paragraph E of the Recitals.

Cover Loan and Cover Loans have the meaning set forth in Section 4.1.2(C)(1) above.

Covering Person and Covering Persons have the meaning set forth in Section 4.1.2(C)(1) above.

Deed has the meaning set forth in Paragraph C of the Recitals.

Deed of Trust has the meaning set forth in Paragraph A of the Recitals.

Default Rate has the meaning set forth in Section 4.1.2(A) above.

Defaulting Member has the meaning set forth in Section 4.1.2(C)(1) above.

Deficiency Amount has the meaning set forth in Section 4.1.2(C)(1) above.

GAAP has the meaning set forth in Section 6.2.

Lender Majority means Members holding Member Interests reflecting Percentage Interests in the Loan of fifty-one percent (51%) or more as provided in Section 3.4.3(A) above.

Lender has the meaning set forth in Paragraph A of the Recitals.

Loan has the meaning set forth in Paragraph A of the Recitals.

Losses means the net losses of the Company for federal income tax purposes (or as may be otherwise required to comply with the Allocation Regulations) as determined as of the close of the Company's fiscal year and, when the context requires, related items of deduction or loss, tax preference, credit and depreciation, provided that "Losses" shall include items described in Code Section 705(a)(2)(B) or required by the Income Tax Regulations to be treated as so described.

Manager has the meaning set forth in Paragraph D of the Recitals.

Member has the meaning set forth in Paragraph E of the Recitals, plus any other Person who becomes a Substituted Member as provided herein.

Member Interest has the same meaning as Percentage Interest in the Company defined in Paragraph F of the Recitals and Section 3.1.

Member List has the meaning set forth in Section 3.4.9.

Minimum Compensation has the meaning set forth in Section 3.4.8 above.

Nevada Act means Chapter 86 of the Nevada Revised Statutes, as the same may be amended from time to time, or the corresponding provisions of any subsequent Nevada law governing limited liability companies.

Non-Participating Lenders has the meaning set forth in Paragraph E of the Recitals.

Note has the meaning set forth in Paragraph A of the Recitals.

Operating Expenses has the meaning set forth in Section 4.1.2(B) above.

Percentage Interest in the Company has the meaning set forth in Paragraph F of the Recitals and in Section 3.1.1.

Percentage Interest in the Loan has the meaning set forth in Paragraph A of the Recitals. and in Section 3.1, which Percentage Interest in the Loan for each Lender is set forth on Exhibit A hereto.

Person means a corporation, association, trust, limited liability company, member organization, cooperative, joint venture or co-venture, partnership, limited partnership, other business entity of any nature, individual, government or political subdivision thereof or governmental agency.

Profits means the net profits of the Company for federal income tax purposes (or as may otherwise be required to comply with the Allocation Regulations) as determined as of the close of the Company's fiscal year, and, when the context requires, related items of income or gain, provided that Profits shall include income exempt from tax.

Real Property has the meaning set forth in Paragraph A of the Recitals and is the Real Property is specifically identified in Exhibit C attached.

Servicing Agreement has the meaning set forth in Paragraph B of the Recitals.

Special Meeting has the meaning set forth in Section 3.4.5(B) above.

Substitute Member means a person who has acquired Member Interests from a Member and who has been admitted to the Company as a Member as provided in Section 7.1.

Third Party Loans has the meaning set forth in Section 4.1.2(B) above.

IN WITNESS WHEREOF, the Manager and the Members of the Company as set forth on Exhibit D, have executed this Operating Agreement, effective as of the date first above written. This Operating Agreement is executed in one or more counterparts all of which shall comprise and be one Agreement.

**MANAGER:**

_____

By: _____

EXHIBIT A

Lenders, Percentage Interests, Etc.



EXHIBIT B

PROMISSORY NOTE

EXHIBIT C

DESCRIPTION OF REAL PROPERTY

EXHIBIT D

LIST OF MEMBERS

| Name | Membership Interest | Initial Capital Account |
| --- | --- | --- |