1　ALAN R. SMITH, ESQ.,
　　Nevada Bar No. 1449
2　Law Offices of Alan R. Smith
　　505 Ridge Street
3　Reno, Nevada  89501
　　Telephone: (775) 786-4579
4　Facsimile: (775) 786-3066
　　**email: mail@asmithlaw.com**

5
　　Counsel for Debtor

6

7

8

9

10

11

*ELECTRONICALLY FILED - July 11, 2012*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

—ooOoo—

IN RE:　　　　　　　　　　　　CASE NO. BK-S-11-13537-LBR
　　　　　　　　　　　　　　　　Chapter 11
INTEGRATED FINANCIAL
ASSOCIATES, INC, a Nevada　　**MOTION FOR ORDER APPROVING**
corporation,　　　　　　　　　**SETTLEMENT AGREEMENT**

　　　Debtor.　　　　　　　　　Hearing Date:　　August 22, 2012
　　　　　　　　　　　　　　　　Hearing Time:　　2:00 p.m.

_____/

　　　Debtor, INTEGRATED FINANCIAL ASSOCIATES, INC., by and through their

counsel, ALAN R. SMITH, ESQ., hereby requests an order of the Court approving a

settlement agreement (the "Settlement Agreement") attached hereto as Exhibit A.  The

Settlement Agreement was entered into between INTEGRATED FINANCIAL

ASSOCIATES, INC. ("IFA") and MICHAEL CLEVENGER ("Guarantor"), and GOLDEN

STATE INVESTMENTS, LP, GOLDEN STATE INVESTMENTS II, LP, AND

PEGASUS-MH VENTURES I, LLC (hereinafter collectively referred to as the "Mountain

House Entities").  This Motion is made pursuant to F.R.Bankr.P. 9014 and 9019, the Points

and Authorities set forth below, the pleadings and papers on file herein, and such other

matters and evidence as may be presented at the hearing hereon.

**POINTS AND AUTHORITIES**

1.　　Summary Of The Compromise

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ. Fin Assoc\Settlement (Clevenger)\Mot Appr Stlmt Clevenger 070912.wpd

1    In brief summary, approval of the Settlement Agreement will accomplish the

2  following:

3          •    A resolution to a dispute between the Debtor and a third-party

4               Guarantor.

5          •    A potential recovery to the Debtor's estate of approximately $161,200.

6  2.    Factual History

7          In 2006, IFA made two loans secured by deeds of trust to the  Mountain House

8  Entities (the "Mountain House Loans") on properties located in San Jacinto County, CA.

9  IFA Loan No. 26-019 involves a first trust deed in the amount of $3,300,000 encumbering

10 11.38 acres of unimproved land with an approved tentative tract map for 53 single family

11 lots in the master planned community called "Mountain House". Mountain House is located

12 approximately midway between the cities of  Tracy and Livermore, approximately 35

13 minutes east of San Francisco, California.  IFA Loan 26-020 involves a second lien trust

14 deed in the amount of $2,300,000 encumbering the same 11.38 acre tract as well as a third

15 lien  trust deed encumbering a parcel tentatively mapped for 286 residential lots and

16 previously encumbered a 135 acre commercial project, all located in Mountain House.  A

17 first trust deed on the 135 acre commercial project foreclosed in 2009 and extinguished the

18 IFA lien on that property. IFA sold a majority of the interests in the Mountain House Loans,

19 in fractional undivided interests, to several investors (the "Loan Inventors"). IFA retained

20 less than a 1% interest in Loan No. 26-019 and a 40.3% interest in Loan No. 26-020.

21 Michael Clevenger (the Guarantor") executed personal guarantees in connection with the

22 Mountain House Loans (collectively, the "Guarantees").  The Guarantor has no affiliation

23 with the Debtor or any of its principals.

24    Due to the unprecedented decline in property values beginning in late 2008, the

25 Mountain House Loans went into default. IFA estimates that the cost to foreclose Loan No.

26 26-019 would be at least $40,000 and the cost to foreclose Loan No. 26-020 would exceed

27 $30,000.  In both cases, the majority in interest of the Loan Investors  previously voted

28 against expending the funds for a foreclosure.  In addition, the estimated cost to pursue the

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

Guarantor in a state court action in California could easily exceed $50,000, with no assurance of prevailing, and does not take into account the additional costs that would be incurred in attempting to collect a judgment.  In both cases, the Loan Investors have not supported providing the funds related to a foreclosure or filing a suit against the Guarantor.  From 2008 until the present, IFA and the Guarantor discussed possible ways to extend the loans or modify their terms; however, the deepening recession prevented any meaningful settlement.  The Loan Investors did not approve foreclosing on the loans, due to the extraordinary costs involved, such as the cost of a Trustee's Sale Guarantee (normally >1% of the amount of the loan), trustee fees (on average, 0.5% of the loan amount), and other costs related to the foreclosure, preferring to attempt a restructure, rather than foreclose. In early 2012, IFA and the Guarantor attempted to structure a settlement agreement regarding the Mountain House Loans which included requiring the Guarantor to execute unsecured promissory notes, as set forth below,  to the Loan Investors in order to settle potential litigation regarding the guarantees.

IFA sent letters to each of the Loan Investors in both loans advising them of the proposed settlement and requesting that they vote on whether to accept or reject the settlement terms.  As of the date of this motion, the following votes have been received[1]:

| IFA Loan No | Principal Balance | Settlement | In Favor | Opposed | Did Not Vote |
|---|---|---|---|---|---|
| | | | | | |
| 26-019 | $3,300,000 | $600,000 | 51.36% | 6.06% | 42.58% |
| 26-020 | $2,300,000 | $400,000 | 58.04% | 3.26% | 38.70% |

3.     Summary of the Settlement.

A. Payments to Creditors.  The proposed Settlement provides that the Guarantor will execute two unsecured promissory notes payable to the Loan Investors in each of the

---

[1]  The vote on Loan No. 26-020 includes IFA's vote in favor representing 40.3% of the beneficial interests in the loan.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Settlement (Clevenger)\Mot Appr Stlmt Clevenger 070912.wpd            - 3 -

1   Mountain House Loans. The first note will be in the amount of $600,000 payable to the
2   investors in IFA Loan No. 26-019, with a term of five (5) years, and will bear interest at the
3   rate of 6% per annum.  No interest will be paid on the note until maturity.  In return, the
4   Loan Investors will convey their beneficial interest in the note and deed of trust to the
5   Guarantor in a Loan Sale Agreement.  A second note will be in the amount of $400,000,
6   payable to the investors in IFA Loan No. 26-020, with a term of five (5) years, and will bear
7   interest at the rate of 6% per annum.  No interest will be paid on the note until maturity.  In
8   return, the Loan Investors will assign their beneficial interest in the note and deed of trust
9   to the Guarantor.  In accordance with the Settlement, the Loan Investors will convey  their
10   deeds of trust in exchange for notes totaling $1,000,000.  As set forth below and in the
11   Declaration of William Dyer, the land securing the IFA Loans has no value in today's
12   market, or in the foreseeable future.

13   As part of its negotiations regarding the Settlement, IFA considered the costs of
14   litigating on the guaranties in California (the law and forum selected in the Guaranty
15   Agreements) and the time it would take to obtain a judgment, as well as the relative merits
16   of the parties' positions.  IFA also received the Guarantor's financial statements indicating
17   that, including contingent liabilities related to other guaranties, the Guarantor presently has
18   a negative net worth, including contingent liabilities associated with other guaranties, of
19   ($78,717,400).  The Guarantor is attempting to resolve all of his contingent liabilities with
20   settlements similar to the one proposed by the Debtor.  However, he has indicated that, in the
21   event he is unsuccessful, he is prepared to file a Chapter 7 bankruptcy petition.  Nonetheless,
22   if the notes are paid as agreed by the Guarantor, the Debtor anticipates a total recovery in
23   excess of $161,200 being returned to the Debtor's estate for the benefit of the unsecured
24   creditors (this represents the recovery of IFA's 40.3% interest in IFA Loan No. 26-020). In
25   addition, the notes elect Nevada law and Nevada jurisdiction, meaning that, if the notes are
26   not paid, an action could be brought in a Nevada court, reducing the expense to the Loan
27   Investors and increasing the likelihood of success as the Settlement will require the
28   Guarantor to waive any defenses to any subsequent actions.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada   89501
(775) 786-4579

H:\Integ Fin Assoc\Settlement (Clevenger)\Mot Appr Stlmt Clevenger 070912.wpd                - 4 -

Like many other real estate development projects in the country, the land values in the Mountain House development drastically declined following 2007. As a self contained, master planned development the project has fees and costs related to lot development for a water treatment plant, sewage treatment plant, and other costs that inflate the cost to finish a lot to nearly twice its current market value. Discussions with local builders indicate that the cost to improve a single lot in the development run between $155,000 per lot to $170,000 per lot **without** attributing any value to the land. Sales of finished lots in the subdivision have ranged from $49,500 per lot (April 2012) to $114,300 per finished lot in June 2010. There is, therefore, no value attributable to the land value of the lot being sold, as every lot has sold for less than the amount it costs to finish the lot (a "finished" lot consists of a lot with all utilities installed, roads built, fees paid, grading completed, etc.)  (See Dyer Declaration).

B. <u>Release of Guarantees</u>.

Any and all "Guarantees" issued by Michael Clevenger for the Mountain House Loans shall be cancelled and the Guarantor shall be released from all liability thereunder, except for the obligation to pay on the notes, as set forth herein.

C. <u>Investor Approval</u>. The Settlement requires, in order for it to be binding on the parties, (i) that a majority of the Loan Investors in each of the Mountain House Loans have approved its terms, and (ii) that this Court approve the Settlement. By April 15, 2012, the majority of the Loan Investors in each of the loans had voted in favor of accepting the Settlement (IFA voted in favor of the Settlement, which vote remains subject to the Court's approval).  In order to effectuate the Settlement,  the Loan Investors will be required to convert their undivided beneficial interests in the Mountain House Loans into identical membership interests in two separate limited liability companies to be managed by the Debtor.  As part of the voting process, the investors voting in favor of the Settlement also agreed to convert their interests in the Mountain House Loans to membership interests in LLCs.  The Debtor will receive a management fee to manage these entities, at a rate to be determined.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ. Fin Assoc\Settlement (Clevenger)\Mot Appr Stlmt Clevenger 070912.wpd

- 5 -

1    D. <u>Default</u>.  In the event of a default by the Guarantor under the terms of the

2 Settlement, the Debtor, as manager of the various LLC's, will, following the expiration of

3 any applicable notice and cure periods, take action to enforce the notes.  The Debtor

4 proposes that the costs of any such action would be paid by the members of the separate

5 LLCs .

6 4. <u>Legal Analysis</u>

7    The Bankruptcy Court may approve a compromise or settlement agreement between

8 an estate and another party pursuant to F.R.Bankr.P. 9019(a) which provides:

9        On motion by the trustee and after notice and a hearing, the court may approve

10        a compromise or settlement.  Notice shall be given to creditors, the United

11        States trustee, the debtor, and indenture trustees as provided in Rule 2002 and

12        to any other entity as the court may direct.

13 In the Ninth Circuit, four factors must be considered in determining the fairness and

14 reasonableness of a settlement, which are  (1) the likelihood of success on the merits of the

15 underlying litigation with due consideration for uncertainty in the facts and law; (2) the

16 complexity of the litigation involved and the expense, inconvenience and delay necessarily

17 attending it; (3) difficulties, if any, to be encountered in collection; and (4) paramount

18 interest of creditors and proper deference to their reasonable views in the premises.  <u>In re A</u>

19 <u>& C Properties</u>, 784 F.2d 1377 (9th Cir. 1986).  Compromises are favored under the

20 Bankruptcy Code, and approval of a compromise rests on the sound discretion of the Court.

21 <u>Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>,

22 390 U.S. 414, 424 (1968), <i>reh. den.</i> 392 U.S. 909, 20 L. Ed. 2d 425, 88 S. Ct. 1157 (1968);

23 <u>In re A & C Properties</u>, 784 F.2d at 1380-81.  If the compromise is fair and equitable and in

24 the best interests of the creditors, the Court may approve the compromise.  <u>TMT Trailer</u>

25 <u>Ferry</u>, 390 U.S. at 424; <u>Jacobson v. Robert Speece Properties, Inc.</u>, 159 B.R. 314, 317

26 (Bankr. E.D. Cal. 1993).  The Bankruptcy Court is afforded wide latitude in approving

27 compromise agreements which it determines to be fair, reasonable and adequate.  <u>In re</u>

28 <u>Woodson</u>, 839 F.2d 610 (9th Cir. 1988).  The Court need not conduct an exhaustive

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Settlement (Clevenger)\Mot Appr Stlmt Clevenger 070912.wpd          - 6 -

1  investigation into the claim sought to be compromised.  In re Walsh Construction, Inc., 699

2  F.2d 1325, 1328 (9th Cir. 1982). The following addresses the individual factors set forth in

3  In re A&C Properties, supra.

4     A.    Likelihood Of Success On The Merits.

5     The cost and complexity of suing the Guarantor on his guaranties present a

6  multiplicity of problems for the Debtor and the  Loan Investors. Any suit would have to be

7  filed in California State court and would require the Loan Investors to pay for all of the costs

8  of the litigation.  In addition, taxes on the various properties secured by the Mountain House

9  Loans now exceed $287,680 and must be paid by May 2013.  Finally, property values have

10 declined severely in the Mountain House master planned community to the point where

11 unfinished, mapped lots have a negative value.  Fully finished lots are currently selling for

12 less than 33% of the cost to complete them, meaning the land has virtually no value (See

13 Dyer Declaration).

14    The Settlement resolves the issues relating to the disparate interests of the Loan

15 Investors by agreeing to compensate the holders of junior and senior liens in a fair and

16 equitable manner, which has been approved by a written vote of a majority of the Loan

17 Investors in each loan.  IFA has tabulated the results of the Loan Investors' votes and has

18 retained hard copies of all votes received. The Guarantor is offering a substantial settlement

19 amount to both sets of Loan Investors, which is much more than the properties are worth

20 today..  The likelihood of the Debtor and the Loan Investors obtaining a larger judgment

21 against the Guarantor should the litigation move forward is not only highly speculative, but

22 would be extremely costly to prosecute.  A review of the Guarantor's financial statements by

23 the Debtor's management indicates that, in light of the substantial contingent liabilities faced

24 by the Guarantor, the proposed Settlement offers the best chance of recovery for the Debtor

25 and the Loan Investors and that, should the Settlement not be approved, there is a  likelihood

26 that the Guarantor would file for bankruptcy protection.

27 ///

28 ///

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Settlement (Clevenger)\Mot Appr Stlmt Clevenger 070912.wpd

- 7 -

B.    Complexity Of Litigation.

Any litigation to recover against the Guarantor would be extremely costly to the estate. The Debtor's legal fees could well exceed a hundred thousand dollars. It is also likely that the losing party in any litigation might appeal the matter, both to the California Court of Appeals and then possibly to the California Supreme Court, leading to the delay of an additional four to five years in order to resolve the appeals as well as substantial additional cost. In short, the cost of litigation would likely consume any possible additional recovery that might be enjoyed by the Debtor or the Loan Investors.

C.    Difficulties In Collection Of A Judgment.

A review of the financial statement prepared by Michael Clevenger indicates that, should the Debtor prevail in its suit, a larger judgment would likely force the Guarantor to seek bankruptcy protection. Such an action could jeopardize the Debtor's ability to collect on its judgment and, again, require the expenditure of additional fees and costs to prosecute its claim in a bankruptcy action.

D.    Interests Of Creditors.

The interests of creditors weighs heavily in favor of approving the proposed settlement. The proposed settlement avoids significant risks and costs associated with the litigation, and assures a substantial dividend in less time than could ever reasonably be expected through litigation. The Debtor estimates that the Settlement represents approximately $161,200.00 to be paid to the Debtor, as set forth on Exhibit "B", which reflects a significant accomplishment in light of the fact that a completely successful prosecution of litigation against the Guarantor might not have not produced this high of a dividend.

///
///
///
///
///
///

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Settlement (Clevenger)\Mot Appr Stlmt Clevenger 070912 wpd

- 8 -

## CONCLUSION

Based upon the foregoing, the Debtor requests the Court enter an order approving the proposed Settlement Agreement.

DATED this 11th day of July, 2012.

LAW OFFICES OF ALAN R. SMITH

*/s/ Alan R. Smith*

By_____
ALAN R. SMITH
Attorney for Debtor

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada   89501
(775) 786-4579

H:\Integ Fin Assoc\Settlement (Clevenger)\Mot Appr Stlmt Clevenger 070912.wpd

- 9 -

**EXHIBIT A**

**SETTLEMENT AGREEMENT**

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Settlement (Clevenger)\Mot Appr Stlmt Clevenger 070912.wpd

## SETTLEMENT AND MUTUAL RELEASE AGREEMENT

This Settlement Agreement and Mutual Release (the "Agreement" or "Settlement") is made and entered into as of July ____, 2012 ("Effective Date"), by and between MICHAEL CLEVENGER ("Clevenger" or "Guarantor"), and GOLDEN STATE INVESTMENTS, LP, GOLDEN STATE INVESTMENTS II, LP, AND PEGASUS-MH VENTURES I, LLC (hereinafter collectively referred to as the "Mountain House Entities") on the one hand (collectively, the "Mountain House Parties"), and Integrated Financial Associates Inc. ("IFA") and 42 separate individual loan investors ("Loan Investors") on the other hand. The Mountain House Parties, IFA and the Loan Investors are hereinafter individually referred to as a "Party" and/or collectively referred to as the "Parties."

## RECITALS

A.      WHEREAS, in 2006, IFA made two loans secured by deeds of trust to the Mountain House Entities (the "Mountain House Loans") on properties located in San Jacinto County, CA. IFA Loan No. 26-019 involves a note secured by a first trust deed in the amount of $3,300,000 encumbering 11.38 acres of unimproved land with an approved tentative tract map for 53 single family lots in the master planned community called "Mountain House". Mountain House is located approximately midway between the cities of Tracy and Livermore, approximately 35 minutes east of San Francisco, California. IFA Loan 26-020 involves a note secured by a second lien trust deed in the amount of $2,300,000 encumbering the same 11.38 acre tract as well as a third lien trust deed encumbering a parcel tentatively mapped for 286 residential lots and previously encumbered a 135 acre commercial project, all located in Mountain House. A first trust deed on the 135 acre commercial project foreclosed in 2009 and extinguished the IFA lien on that property. In 2006, IFA sold a majority of the interests in the Mountain House Loans, in fractional undivided interests, to the Loan Investors. The Guarantor executed a personal guaranty for each of the Mountain House Loans (collectively, "Clevenger Guarantees"). The ownership interests of the various Loan Investors are as set forth on Exhibit A attached hereto.

B.      In early 2012, IFA and the Guarantor attempted to structure a settlement agreement regarding the Mountain House Loans which included requiring the Guarantor to execute unsecured promissory notes, as set forth below, to the Loan Investors in order to settle potential litigation regarding the Clevenger Guarantees.

C.      IFA sent letters to each of the Loan Investors in both loans advising them of the proposed settlement and requesting that they vote on whether to accept or reject the settlement terms. IFA obtained approval of the Settlement by a vote of more than 51% of the investors in each note. The Parties anticipate that IFA, through its counsel in the Bankruptcy Action, will file a motion pursuant to Federal Rules of Bankruptcy Procedure, Rules 9014 and 9019, to obtain the approval of the Settlement (the "Approval").

D.      The Parties desire to settle all matters described herein as well as any and all disputes or potential disputes, claims or potential claims, each of the Parties hereto have, had, or may in the future have arising out of any of the Parties' conduct with respect to the Mountain House Loans, including all potential claims between the Parties relating to the Mountain House Loans and the

Clevenger Guarantees, rather than incur the costs of litigation and the uncertainties associated therewith.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.    <u>Incorporation of Recitals</u>.

1.1    The foregoing Recitals are hereby incorporated by this reference as though fully set forth at length herein.

2.    <u>Consideration and Settlement</u>.  In consideration of the releases set forth below and other consideration as provided herein, the Parties will perform the following:

2.1    Except for the Settlement Payment obligation as defined under Section 2.2 below, IFA and the Loan Investors shall hereby irrevocably exonerate, release and discharge the Mountain House Parties, and their respective officers, directors, agents, attorneys and employees, and their respective successors and assigns (collectively the "Releasees") from any and all obligations, duties, covenants and responsibilities under the Mountain House Loans and the Clevenger Guarantees, and from any and all claims, demands, actions, causes of action, debts, costs and liabilities whatsoever whether in law or equity, which IFA and the Loan Investors had, now have or hereafter can, shall or may have against the Releasees arising from or related to the Mountain House Loans and Clevenger Guarantees, including, but not limited to, claims and/or potential claims arising out of or relating to the Mountain House Loans. IFA and the Loan Investors shall write "RELEASED AND DISCHARGED" at the top of the first page of each of the original Clevenger Guarantees, and deliver the original Clevenger Guarantees with the "RELEASED AND DISCHARGED" markings to Clevenger within 30-days of obtaining the Approval.

2.2    As payment for the releases provided in this Agreement (the "Settlement Payment"), Guarantor will execute two (2) unsecured promissory notes (the "Guarantor Notes"), substantially in the form attached hereto as <u>Exhibit B1</u> and <u>Exhibit B2</u>, payable to the Loan Investors in each of the Mountain House Loans, as follows:

2.2.1    The first note will be in the amount of $600,000 payable to the investors in IFA Loan No. 26-019, with a term of five (5) years, and will bear interest at the rate of 6% per annum.  No interest will be paid on the note until maturity.

2.2.2    The second note will be in the amount of $400,000, payable to the investors in IFA Loan No. 26-020, with a term of five (5) years, and will bear interest at the rate of 6% per annum.

2.3    IFA, individually, and as attorney-in-fact for the Loan Investors, will enter into a Loan Sale Agreement, substantially in the form of <u>Exhibit C</u> attached hereto, providing for

the sale and transfer of the Mountain House Loans to Regents Gate Investors, LLC, a California limited liability company, in exchange for the Guarantor Notes.

3.    [INTENTIONALLY BLANK]

4.    Effective Date of Release. All releases in the Agreement shall be effective upon obtaining the Approval.

5.    Mutual Release.

5.1    As between the Mountain House Parties and IFA, for themselves and each of their predecessors-in-interest, spouses, relatives, subsidiaries, affiliates, representatives, agents, partners, co-owners, joint venturers, employees and attorneys, past and present, successors, assigns, heirs, executors, administrators and transferees, hereby release any and all causes of action, claims, demands, damages, expenditures, costs, attorney fees, liens, obligations and liability of any type or nature, whether known or unknown, suspected or unsuspected, which the Mountain House Parties and IFA may now have or claim to have against each other, or have at any time heretofore had, including but not limited to by reason of the matters set forth herein.

5.2    As between the Mountain House Parties and the Loan Investors, for themselves and each of their predecessors-in-interest, spouses, relatives, subsidiaries, affiliates, representatives, agents, partners, co-owners, joint venturers, employees and attorneys, past and present, successors, assigns, heirs, executors, administrators and transferees, hereby release any and all causes of action, claims, demands, damages, expenditures, costs, attorney fees, liens, obligations and liability of any type or nature, which the Mountain House Parties and the Loan Investors may now have or claim to have against each other, or have at any time heretofore concerning the Clevenger Guarantees and the Mountain House Loans.

6.    [INTENTIONALLY BLANK]

7.    Settlement of Disputed Claims.    The Parties hereby acknowledge that this Agreement affects the settlement of disputed claims and should not be construed as an admission of liability on the part of any Party hereto. No Party is admitting the sufficiency of any claim, allegation, assertion, contention or position of any other Party, nor the sufficiency of any defense to any such claim, allegation, assertion, contention or position. The Parties have entered into this Agreement in good faith and with the desire to forever settle and resolve their claims.

8.    Entire Agreement, Modifications and Waiver.    This Agreement constitutes the entire agreement between the Parties with respect to such terms as are included herein and the Parties acknowledge that they have not executed this instrument in reliance on any promise or representation or warranty not contained herein. This Agreement supersedes and replaces all prior settlement negotiations and/or proposed settlements. No alteration, supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all of the Parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver

constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver.

9.    Applicable Law, Jurisdiction and Venue.   This Agreement shall be deemed to have been entered into and shall, in all respects, be interpreted, construed, enforced and governed by and under the laws of the State of Nevada. The Clark County District Court shall have jurisdiction over the matters presented herein.

10.    Jointly Drafted.   It is agreed between the Parties that this Agreement was jointly negotiated and jointly drafted by the Parties and that it shall not be interpreted or construed in favor or against any Party on the ground that said Party drafted the Agreement. It is also agreed and represented by the Parties that this Agreement was the result of extended negotiations between the Parties and their respective counsel and that each of the Parties were of equal or relatively equal bargaining power. In no way whatsoever shall it be deemed that this Agreement is a contract of adhesion, is unreasonable or unconscionable, or that any Party entered into this Agreement under duress. The language of this Agreement shall be construed as a whole according to its fair and logical meaning and not strictly for or against any of the Parties.

11.    Section Headings, Gender and Syntax.   The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the construction or interpretation of this Agreement. Whenever in this Agreement the context so requires, the masculine or feminine or neuter gender and the singular and plural number shall be deemed to refer and include the other.

12.    Independent Legal Counsel.   The Mountain House Parties and IFA hereby acknowledge that they have had the opportunity to retain independent legal counsel of their own choice throughout all of the negotiations which preceded the execution of this Agreement and that each Party has executed this Agreement with the consent and on the advice of such independent legal counsel.

13.    Additional Documents.  To the extent that it is necessary or appropriate to prepare and execute any additional documents in order to effectuate this Agreement, the Parties agree to do so in a timely manner.

14.    No Assignment of Claim.  The Parties hereby represent and warrant to each of the other Parties that no claims they might have, or do have, and which are otherwise referenced and released by this Agreement, have been assigned or transferred to any person, corporation or other entity, either voluntarily or involuntarily, and that there are no lawsuits pending between the Mountain House Parties and IFA, to the best of IFA's knowledge there are no lawsuits pending between the Mountain House Parties and the Loan Investors, and to the best of the Mountain House Parties' knowledge there are no lawsuits pending between the Mountain House Parties and the Loan Investors. The Parties hereby agree that they will indemnify and hold each of the other Parties harmless from any loss, including attorney fees and costs incurred, which may result from breach of any term or condition of this Agreement.

L:\2006 Loans\26-019 Golden State Inv. II\Settlement\Settlement Agreement.doc

15.     Binding on Successors.  This Agreement shall be binding on and inure to the benefit of the Parties hereto and their respective heirs, legal representatives, successors, assigns, executors and administrators.

16.     No Third Party Rights.  Except as otherwise expressly set forth herein, nothing contained in this Agreement is intended to confer any right or benefit upon any person or entity other than the Parties hereto and their successors.

17.     Severability.  If any provision of this Agreement is held invalid or unenforceable, in whole or in part, by any court of final jurisdiction, it is the intent of the Parties that all other provisions of this Agreement be construed to remain fully valid, enforceable and binding on the parties in all respects as if such invalid or unenforceable provision were omitted.  Any court of final jurisdiction will have the authority to modify or replace the invalid or unenforceable term or provision with a valid and enforceable term or provision that most accurately represents the intention of the Parties.

18.     Attorney Fees.  Each Party shall bear their own respective attorney fees, costs and expenses regarding this Agreement, including those incurred in the preparation of this Agreement.  If any legal action or any motion or other proceeding is brought for the enforcement of this Agreement (including enforcement of the Stipulation) or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorney fees and other costs and expenses incurred in that action or proceeding in addition to any other relief to which it or they may be entitled.

19.     Counterparts, Fax and Electronic Transmission.    This Agreement may be executed in counterpart and exchanged by facsimile or other electronic means, including scan or email, and all original, facsimile or electronic counterparts, when taken together, shall be valid as one instrument as though signed in original on a single page.

20.     Authorization.  Any Party signing this Agreement on behalf of an entity, on behalf of a third party or third parties or other than themselves, hereby represents and warrants that such Party has authority to sign on behalf of the indicated entity, or third party or parties.  The Parties warrant and represent that, subject to the Approval under Recital C above, they have full authority to settle all issues concerning the Mountain House Loans and the Clevenger Guarantees, and any other documents or agreements between the Parties concerning the Mountain House Loans and Clevenger Guarantees.

20.1    IFA is executing this Agreement pursuant to the authority set forth in the Loan Servicing Agreements and Limited Power of Attorney between IFA and the Loan Investors concerning the Clevenger Guarantees and the Mountain House Loans (copies of which have not been provided to the Mountain House Parties), and authority granted to it under Nevada Revised Statutes 645B.340. IFA represents and warrants that it, based on the foregoing, has the authority to execute this Agreement on behalf of the Loan Investors and, *inter alia*, grant the releases to the Mountain House Parties provided for herein. IFA makes no other representation or warranty as to its authority to execute the Agreement on behalf of the Loan Investors.

IN WITNESS WHEREOF the Parties hereto have executed this Agreement as of the Effective Date above. The undersigned hereby warrant that they are legally authorized and entitled to settle and to release every claim herein released and to give a valid, full and final acquittance therefore.

Dated:_____, 2012

GOLDEN STATE INVESTMENTS, LP
By:_____
Its:_____

Dated:_____, 2012

GOLDEN STATE INVESTMENTS II, LP
By:_____
Its:_____

Dated:_____, 2012

PEGASUS-MH VENTURES I, LLC
By:_____
Its:_____

Dated:_____, 2012

MICHAEL CLEVENGER

Dated:_____, 2012

INTEGRATED FINANCIAL ASSOCIATES INC.
By:_____
Its:_____

Dated:_____, 2012

LOAN INVESTORS (By IFA on their behalf)
By:_____
Its:_____

# EXHIBIT A

## LOAN INVESTORS

**LOAN FUNDING**
**26-019-GOLDEN STATE INVESTMENTS II, LP**

| Lender Name | Pct Owned | Principal Balance | Settlement w/o Accrued Interest |
|---|---|---|---|
| Integrated Financial Associates | 0.061% | $2,000 | $363.64 |
| TGA, L.L.C. | 10.000% | $330,000 | $60,000.00 |
| JA Kretsch Financial Retirement Plan | 1.909% | $63,000 | $11,454.55 |
| SCWAK, LLC | 4.545% | $150,000 | $27,272.73 |
| Rick Templeton | 5.303% | $175,000 | $31,818.18 |
| Kalb Construction Co. Profit Sharing Plan | 4.545% | $150,000 | $27,272.73 |
| Mark Heese | 9.091% | $300,000 | $54,545.45 |
| Bobi J. Templeton Family Trust | 1.515% | $50,000 | $9,090.91 |
| TD3 Trust | 3.030% | $100,000 | $18,181.82 |
| The Meritage Trust | 7.576% | $250,000 | $45,454.55 |
| Ruth Oshins Revocable Family Trust | 1.515% | $50,000 | $9,090.91 |
| Glenn Raynes & Rene M. Raynes Revocable Family Trust | 10.000% | $330,000 | $60,000.00 |
| George & Adela Smith Family Trust DTD 9/14/98 | 1.515% | $50,000 | $9,090.91 |
| The 1994 Cisneros Family Trust | 6.061% | $200,000 | $36,363.64 |
| Brown Family Trust DTD 11/21/86 | 3.030% | $100,000 | $18,181.82 |
| George D. Kalb & Barbara A. Kalb Rev. Family Trust | 6.061% | $200,000 | $36,363.64 |
| Jon A. Griffin Sr. & Judy A. Griffin Revocable Trust | 1.515% | $50,000 | $9,090.91 |
| Don and Carol Smith | 3.030% | $100,000 | $18,181.82 |
| Karen A. Camp | 1.515% | $50,000 | $9,090.91 |
| The Ruth D. Miille Living Trust | 3.030% | $100,000 | $18,181.82 |
| Nancy Lee W. Fiddyment Revocable Trust | 3.030% | $100,000 | $18,181.82 |
| Nadie Meland & Micki Esken Living Trust | 3.030% | $100,000 | $18,181.82 |
| Hilary J. Kalb Trust | 1.515% | $50,000 | $9,090.91 |
| Pravin P. Bakrania and Veena P. Bakrania Living Trust | 4.545% | $150,000 | $27,272.73 |
| Pravin P. Bakrania and Veena P. Bakrania Living Trust | 3.030% | $100,000 | $18,181.82 |
| | 100.000% | $3,300,000 | $600,000.00 |

**LOAN FUNDING**
**26-020-GOLDEN STATE INVESTMENTS, LP & PEGASUS-MH VENTURES I, LLC**

| Lender Name | Pct Owned | Principal Balance | Settlement w/o Accrued Interest |
|---|---|---|---|
| Integrated Financial Associates | 39.268% | $903,163.27 | $157,071.87 |
| Integrated Financial Associates | 1.087% | $25,000.00 | $4,347.83 |
| The Zabran Family Trust | 10.870% | $250,000.00 | $43,478.26 |
| Mustapha Assi Rev. Living Trust 6/23/03 | 14.130% | $325,000.00 | $56,521.74 |
| Stephanie Kropp | 2.174% | $50,000.00 | $8,695.65 |
| Patrick M. Rich Trust DTD April 4, 2001 | 3.261% | $75,000.00 | $13,043.48 |
| Michael J. Proto & Helen Proto Revocable Living Trust | 1.087% | $25,000.00 | $4,347.83 |
| The 1994 Cisneros Family Trust | 4.348% | $100,000.00 | $17,391.30 |
| VG Revocable Trust | 4.645% | $106,836.73 | $18,580.30 |
| George Zabran  III | 3.261% | $75,000.00 | $13,043.48 |
| LMC Living Trust | 1.739% | $40,000.00 | $6,956.52 |
| Richard Kropp cust., UGMA Sebastian Kropp | 2.174% | $50,000.00 | $8,695.65 |
| Richard Kropp, cust. UGMA Remington Kropp | 2.174% | $50,000.00 | $8,695.65 |
| Richard Kropp, cust. UGMA Emerson Kropp | 2.174% | $50,000.00 | $8,695.65 |
| Skye Enterprises, LLC | 2.174% | $50,000.00 | $8,695.65 |
| The Proto Family Trust | 1.087% | $25,000.00 | $4,347.83 |
| Sharon Brashear | 2.174% | $50,000.00 | $8,695.65 |
| Brenner Revocable Trust DTD 5/12/97 | 2.174% | $50,000.00 | $8,695.65 |
| | 100.000% | $2,300,000.00 | $400,000.00 |

**EXHIBIT B1**

**PROMISSORY NOTE FOR $600,000**

# PROMISORY NOTE

_Approved as to form TX [signature] 5/7/12_

_____, 2012                                                    $600,000.00

1.    <u>Parties</u>. This Promissory Note ("Note") dated and effective as of _____, 2012 ("Note Date") is entered into by and between Michael A. Clevenger an unmarried man, whose address is 390 Railroad Avenue, Danville, Contra Costa County, California 94526, as (Borrower") and Integrated Financial Associates, Inc., individually and on behalf of the investors set forth on Exhibit A attached hereto and incorporated herein by this reference (collectively "Lender") or at such other place as Lender may designate to Borrower in writing from time to time.

2.    <u>Loan</u>. For value received, Obligor promises to pay the order of Lender, at Las Vegas, Nevada, the principal sum of **Six Hundred Thousand Dollars and No Cents ($600,000.00 )** ("Loan Amount") together with Interest on the principal balance there of as is, from time to time, outstanding, and all other charges herein due and payable, from the Note Date through the Maturity Date, in lawful money of the United States of America which at the time of payment, is legal tender in payment of all debts, public and private

3.    <u>Loan Purpose</u>.  The purpose for this Note is in full satisfaction of all claims held by Lender under Obligor's guaranty dated June 2, 2006, executed by Obligor, as guarantor, to Integrated Financial Associates, Inc. ("IFA") as lender, securing that certain Promissory Note in the original principal amount of $3,300,000 from Golden State Investments II, LP to IFA.  Obligor acknowledges that IFA assigned beneficial interests in the loan to investors set forth on Exhibit A.

4.    <u>Note Term/Maturity Date</u>. The Note term ("Term") starts on the Note Date and ends on _____, 2017 (the "Maturity Date).

5.    <u>Interest Rate, Payment</u>.  Except as set forth in Section 6.5, interest shall accrue on the Note at the annual rate of  **Six percent (6.00 %) per annum** ("Note Rate") on the basis of a 360-Day year that includes twelve (12) 30-Day calendar months and the actual number of Days elapsed for any partial Interest calculation month, all of which is payable as set for the herein on the outstanding principal amount hereof from the Note Date until the Note has been paid in full, provided that in no event shall the Interest charged exceed the maximum permitted by applicable law. Interest shall accrue and be payable on, but no later than the Maturity Date.  If through any contingency or event, Lender Receives or is deemed to have Received Interest that exceeds the lawful maximum, the entire excess amount automatically shall be deemed to have been applied when Received to, and shall reduce the principal balance of, this Note, or Promptly shall refunded, as applicable.

6.    <u>Payment Receipt; Prepayment; Non-Revolving Loan</u>.

6.1    <u>Payment Receipt</u>. A payment only shall be "Received" by Lender (and Lender's "Receipt" thereof) if it is (a) an Unconditional Payment; (b) made for the full amount then due (or more); (c) delivered to the address designated by Lender; (d) in Lender's possession before the applicable Delinquency Date; and (e) honored by the financial institution upon which is drawn the first time it is presented for payment or deposit or otherwise negotiated.

6.2    <u>Delinquency Date</u>. A payment due hereunder shall become delinquent (a "Delinquent Payment") if Lender has not Received the full amount thereof before the fifth (5th) calendar

Day after that payment first became due ("Delinquency Date"). Time is of the essence: no Delinquency Date shall be extended because it falls on a non-Business Day, but a payment otherwise Received by the Lender before the applicable Delinquency Date shall not become a Delinquent Payment only because Lender elects to present it for payment on or after the Delinquency Date.

6.3    Repayment. Obligor shall pay to Lender the unpaid principal balance and all other amounts due hereunder no later than the Maturity Date.

6.4    Application of Payment Amounts Received. All payments and prepayments Received by Lender first shall be applied first to Late Charges, then to Interest, and then to the unpaid principal balance.

6.5    Prepayment. At the option of Obligor, the principal amount of the indebtedness evidenced by this Note may be prepaid in whole or in part at any time, with accrued Interest, to the date of such prepayment on the amount prepaid, without penalty or premium and subject to the discount as referenced herein for early payment. In the event Obligor pays off this Note in full on or before _____, 2015 the Note Rate applied for the accrued interest shall be reduced to 4.8%.

7.    Default.

7.1    Events of Default. Separately, each of the following constitutes an independent event of default ("Event of Default"), the occurrence which shall, at the option of Lender and without notice to Obligor, cause all unpaid principal, Interest and late charges under this Note at once to become due and payable, thereby accelerating the Maturity date and rendering all such amount subject to immediate collection, whether or not there has been a prior demand, and without any need to make demand, for payment and regardless of any alternate Maturity Date:

(a)    The appointment, pursuant to an order of a court of competent jurisdiction, or a trustee, receiver, or liquidator of Obligor, or any attachment, execution, or other judicial seizure of all or any substantial portion of Obligor's assets which attachment, execution, or seizure is not discharged within thirty (30) Days.

(b)    If Obligor is enjoined, restrained or in any way prevented by court order from conducting all or a substantial part of its business affairs, and such proceedings or injunction have not been dismissed or stayed within thirty (30) Days from the date of filing of such proceedings or entry of such injunction.

(c)    The filing by or against Obligor of a petition in bankruptcy or for an arrangement or for reorganization or other form of debtor relief pursuant to the federal Bankruptcy Act, as amended or replaced from time to time, o any other law, federal or state, whether now existing or hereafter amended or enacted, relating to insolvency or debtor relief (except in the case of a filing against Obligor, default shall not exist unless Obligor fails to have the proceeding discharged within thirty (30) Days after the filing), or the adjudication of Obligor as bankrupt or insolvent by a decree of a court of competent jurisdiction, or the assignments by Obligor for the benefit of creditors, or the admission by Obligor in writing of its inability to pay its debts generally as they become due, or Obligor's consent to the appointment of a receiver or receivers of all or any part of its property.

(d)    Obligor becomes insolvent or bankrupt, is generally not paying its debts as they become due, or makes an assignment for the benefit of creditors, or a trustee or receiver is

appointed for the Obligor or for the greater part of the properties of the Obligor with the consent of the Obligor, or if appointed without the consent of the Obligor, such trustee or receiver is not discharged within thirty (30) Days, or bankruptcy, reorganization, liquidation or similar proceedings are instituted by or against the Obligor are consented to it by Obligor or remain undismissed for thirty (30) Days, or a writ or warrant of attachment or similar process shall be issued against a substantial part of the property of the Obligor and shall not be released or bonded within thirty (30) Days after levy.

(e)     A payment is (i) dishonored by the financial institution upon which is drawn, (ii) made conditionally or (iii) Received by Lender on or after the related Delinquency Date.

(g)     A default by the Obligor in making any payment of principal, Interest, or any other amount payable under this Note when due and/or Lender's non-Receipt of all amounts due hereunder on or before the Maturity Date or Delinquency Date, as applicable.

8.     Late Charge, Default Interest and Remedies.

8.1     Each separate payment of principal or Interest due during the term of this Note or on the Maturity Date including, without limitation, the balloon payment and all accrued Interest and other charges payable no later than the Maturity Date, but not Received by the Lender on or before the Delinquency Date is subject to a one-time, non-recurring late charge due and payable immediately, equal to two percent (2.00%) of the amount delinquent ("Late Charge"). Obligor acknowledges that: (a) under the circumstances existing at the time Obligor signs this Note, it would be extremely difficult and impractical to determine Lender's actual damages resulting from any late payment or default; (b) the Late Charges and default Interest are reasonable estimates of those damages and do not constitute a penalty or forfeiture; and (c) the inclusion of Late Charges and default Interest in this Note were material inducements to Lender to make the Loan.

8.2     Under no circumstances shall Interest accrue, become, or be allowed to become due or be payable at a rate that exceeds the applicable maximum rate of Interest permitted by law to be charged.

8.3     The remedies of Lender in the Note, or at law or in equity, are cumulative and concurrent, and may be pursued singly, successively or together in Lender's discretion.

9.     **Waivers.** OBLIGOR AND ALL OTHER PERSONS NOW OR IN THE FUTURE LIABLE ON THIS NOTE KNOWINGLY, VOLUNTARILY, ABSOLUTELY, IRREVOCABLY AND UNCONDITIONALY WAIVE, RENOUNCE AND, TO THE FULLEST EXTENT ALLOWED BY LAW, DISCLAIM ALL RIGHTS WITH RESPECT TO:

9.1     presentment for payment, demand, notice of demand and of, dishonor and nonpayment of this Note, notice of intention to accelerate the maturity of this Note, protest and notice of protest, diligence in collecting, and the bringing of suit against any other party, and agree to all renewals, extensions, modifications partial payments, or releases of security, in whole or in part, with or without notice, before or after maturity; and

9.2     the benefits of any statute of limitations and any moratorium, reinstatement, marshaling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the Constitution and laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note. The pleading of any statute of

limitations as a defense to an demand against the waived by each and all such parties to the extent permitted by law; and

10.    <u>No Waiver; Amendment</u>. No failure to accelerate the debt evidenced herby by reason of default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (a) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (b) to prevent the exercise of such right of acceleration or any other right granted hereunder or by any applicable laws; and Obligor hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Obligor under this Note, either in whole or in part unless Lender agrees in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

11.    <u>Unconditional Payment</u>. Obligor is obligated to pay principal, Interest, late charges and any and all other amounts which become payable hereunder absolutely and unconditionally ("Unconditional Payment") and without any abatement, and without any reduction for counterclaim or setoff. If, at any time, any payment Received by Lender hereunder is deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Obligor and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

12.    <u>Bankruptcy and Reinstatement.</u> To the maximum extent permitted by law, Obligor agrees that the liability of Obligor under this Note shall in no way be affected by (a) a payment or payments credited for any payment or payments made for the account of or on behalf of Obligor to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any Bankruptcy, State or Federal Law, common law or equitable cause or otherwise; (b) the release or discharge of Obligor in any creditor proceeding, receivership, bankruptcy or other similar proceeding, (c) the impairment, limitation or modification of the liability of Obligor or of any remedy for the enforcement of Obligor' liability resulting from the operation of any present or future provision of **Title 11 of the United States Code, as amended**, or any other statute or proceeding affecting creditors' rights generally, (d) the rejection or disaffirmance of Obligor's obligations hereunder or any portion thereof in any such Proceeding, or € the cessation, from any cause whatsoever, whether consensual or by operation of law, of the liability of Obligor to Lender. The obligations of Obligor hereunder shall be revived, reinstated and continued in full force, and the rights of Lender shall continue, with respect to any amount at any time paid on account of Obligor's obligations hereunder, which shall thereafter be required to be restored or returned by Lender upon the bankruptcy, insolvency or reorganization of Obligor, or otherwise all as though such amount had not been paid.

13.  Assignment/Assumption;. This Note is non-assumable. Obligor may not, under any circumstances, assign or delegate all or any of its rights or obligations under the term of this Note; any assignment or assumption or purported assignment or assumption in violation of this Section (an "Unpermitted Transfer") is an Event of Default hereunder. Lender may assign its interest in this Note freely, upon giving notice to Obligor.

14.  Notice. Any notices, payment or other communication required or permitted to be given hereunder shall be given in writing and delivered (a) in person, (b) by certified mail, postage prepaid, return receipt requested, (c) by a commercial overnight courier that guarantees next Business Day delivery and provides a receipt, or (d) by confirmed facsimile or telecopy, if addressed to Lender at the address set forth in the first paragraph hereto and if addressed to Obligor at the address set forth below its name on the signature page hereto, or to such other address as a party may designate from time to time in a written notice to the other party in accordance with the provisions of this Section. Any notice, payment or other communication shall be deemed delivered when actually delivered, if such delivery is in person, upon deposit with the U.S. Postal Service, if such delivery is by certified mail, upon deposit with the overnight courier service, and upon transmission if such delivery is by confirmed facsimile or telecopy during normal business hours of the recipient, or if not, on the next Business Day.

15.  No Offsets. No indebtedness evidenced by this Note shall be offset by all or part of any claim, cause of action, or cross-claim of any kind, whether liquidated or unliquidated, which Obligor now has or may hereafter acquire or allege to have acquired against Lender. To the fullest extent permitted by law and, except in the case of unreasonable claims, Obligor waives the benefits of any applicable law, regulation, or prodedure which provides, in substance, that where cross demands for money exist between parties at any point in timewhen neither demand is barred by the applicable statute of limitations, and an action is thereafter commenced by one such party, the other party may assert the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the claim would at the time of filing the response be barred by the applicable statute of limitations.

16.  Attorneys' Fees. In a Proceeding that arises out of or in any way related to this Note or a modification hereof, the prevailing party is entitled to recover its attorneys' fees and costs (whether or not otherwise recoverable) in addition to all other relief it obtains. "Proceeding" means any action, suit, litigation, alternative dispute resolution mechanism, inquiry, hearing, investigation or proceeding of any kind commenced in, transferred to, confirmed by or appealed to a court or tribunal of any kind. The obligations in this Section are independent of an in addition to Obligor's obligation to pay Lender's Transactional Legal Fees as provided herein.

17.  Venue/Trial Forum and Consent to Jurisdiction. Obligor irrevocably agrees that: (a) in connection with any Proceeding, the state courts of Nevada have all necessary subject matter jurisdiction for all purposes of that Proceeding; (b)(i) all state courts in Nevada have all authority necessary to exercise personal jurisdiction over it in connection with any Proceeding and (ii) it knowingly and voluntarily submits and consents to the exercise of such personal jurisdiction over it; (c) venue and the trial forum for any Proceeding arising under this Note shall, ineach case, lie and remain *exclusively* in a Nevada state court in **Clark County**, Nevada; and (d) it will not seek, and waives the rights to (i) assert or join in the assertion of doctrine of *forum non conveniens* or (ii) request, or join in any request for a removal to federal court, change of venue or trial forum transfer. Nothing in this Section shall prevent or limit the enforcement of any judgment entered by a court described in this Section by way of sister state judgment, international Proceeding or as otherwise permitted by law.

18.    Miscellaneous. Subject to all applicable transfer limitations, this Note binds and inures to the benefit of Obligor, Lender and their heirs, executors, legal representatives, successors, successor trustees, and assigns. Subject to all applicable transfer limitations the terms "Obligor" and "Lender" are deemed to include their respective permitted heirs, executors, legal representatives, successors, successor trustees, and assigns, whether by voluntary action or operation of law.

All personal pronouns used herein whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa. Titles of articles and section headings are for convenience only an in no way define, limit, amplify or describe the scope or intent of any provisions hereof. Time is of the essence with respect to all provisions of this Note. "Day" means a calendar day. "Business Day" means each Day that is not a Saturday, Sunday or legal holiday under the laws of the United States or the State of California. No ambiguity in any of the Loan Documents shall be construed in favor or against any party thereto or signer thereof. The Loan Documents contained the entire agreement between the parties hereto and thereto relating to the subject matter hereof and thereof and all prior agreements relative hereto and thereto, which are not contained herein or therein are terminated.

19. Representation. Obligor represents, warrants and agrees: (a) before signing, it had a full and fair opportunity to consult with independent legal, tax and other advisors of its own selection regarding the advisability, significance and effect of all of the Loan Documents including this Note and has done so to the extent it deemed necessary; (b) it has read, considered and understands this Note and all of the other Loan Documents and consents to all of the terms and conditions herein and therein; (c) it executes this Note and the other Loan Documents voluntarily; (d) each person signing below has the right and all authority necessary to sign and deliver this Note; (f) except as expressly set forth in this Note, whether oral or written, express or implied; (g) the express representations, warranties and covenants in this Note and in the other Loan Documents are material and sufficient consideration for its execution of this Note and the other Loan Documents; and (h) the terms and conditions of this Note and the other Loan Documents are fair and reasonable under the circumstances existing as of the Note Date.


IN WITNESS WHEREOF, Obligor has executed this Note as of the Note Date.

**OBLIGOR**


_____

Michael A. Clevenger,

An unmarried man

Exhibit A

LIST OF INVESTORS

| Lender Name |
|---|
| Bobi J. Templeton Family Trust |
| Brown Family Trust DTD 11/21/86 |
| Don and Carol Smith |
| George & Adela Smith Family Trust DTD 9/14/98 |
| George D. Kalb & Barbara A. Kalb Rev. Family Trust |
| Glenn Raynes & Rene M. Raynes Revocable Family Trust |
| Hilary J. Kalb Trust |
| Integrated Financial Associates |
| JA Kretsch Financial Retirement Plan |
| Jon A. Griffin Sr. & Judy A. Griffin Revocable Trust |
| Kalb Construction Co. Profit Sharing Plan |
| Karen A. Camp |
| Mark Heese |
| Nadie Meland & Micki Esken Living Trust |
| Nancy Lee W. Fiddyment Revocable Trust |
| Pravin P. Bakrania and Veena P. Bakrania Living Trust |
| Rick Templeton |
| Ruth Oshins Revocable Family Trust |
| SCWAK, LLC |
| TD3 Trust |
| TGA, L.L.C. |
| The 1994 Cisneros Family Trust |
| The Meritage Trust |
| The Ruth D. Miille Living Trust |

**EXHIBIT B2**

**PROMISSORY NOTE FOR $400,000**

L:\2006 Loans\26-019 Golden State Inv. II\Settlement\Settlement Agreement.doc

*Approoved AS to Forty [signature] 5/8/12*

# PROMISORY NOTE

_____, 2012                                                    $400,000.00

1.    Parties. This Promissory Note ("Note")  dated and effective as of _____, 2012 ("Note Date") is entered into by and between Michael A. Clevenger an unmarried man, whose address is 390 Railroad Avenue, Danville, Contra Costa County, California 94526, as (Borrower") and Integrated Financial Associates, Inc., individually and on behalf of the investors set forth on Exhibit A attached hereto and incorporated herein by this reference (collectively "Lender") or at such other place as Lender may designate to Borrower in writing from time to time.

2.    Loan. For value received, Obligor promises to pay the order of Lender, at Las Vegas, Nevada, the principal sum of **Four Hundred Thousand Dollars  and No Cents ($400,000.00 )** ("Loan Amount") together with Interest on the principal balance there of as is, from time to time, outstanding, and all other charges herein due and payable, from the Note Date through the Maturity Date, in lawful money of the United States of America which at the time of payment, is legal tender in payment of all debts, public and private

3.    Loan Purpose.  The purpose for this Note is in full satisfaction of all claims held by Lender under Obligor's guaranty dated June 2, 2006, executed by Obligor, as guarantor, to Integrated Financial Associates, Inc. ("IFA") as lender, securing that certain Promissory Note in the principal amount of $2,300,000 from Golden State Investments II, LP, Golden State Investments, LP, and Pegasus-MH Ventures I, LLC to IFA.  Obligor acknowledges that IFA assigned beneficial interests in the loan to investors set forth on Exhibit A.

4.    Note Term/Maturity Date. The Note term ("Term") starts on the Note Date and ends on _____, 2017 (the "Maturity Date).

5.    Interest Rate, Payment.  Except as set forth in Section 6.5, interest shall accrue on the Note at the annual rate of  **Six percent (6.00 %) per annum** ("Note Rate") on the basis of a 360-Day year that includes twelve (12) 30-Day calendar months and the actual number of Days elapsed for any partial Interest calculation month, all of which is payable as set for the herein on the outstanding principal amount hereof from the Note Date until the Note has been paid in full, provided that in no event shall the Interest charged exceed the maximum permitted by applicable law. Interest shall accrue and be payable on, but no later than the Maturity Date.  If through any contingency or event, Lender Receives or is deemed to have Received Interest that exceeds the lawful maximum, the entire excess amount automatically shall be deemed to have been applied when Received to, and shall reduce the principal balance of, this Note, or Promptly shall refunded, as applicable.

6.    Payment Receipt; Prepayment; Non-Revolving Loan.

6.1    Payment Receipt. A payment only shall be "Received" by Lender (and Lender's "Receipt" thereof) if it is (a) an Unconditional Payment; (b) made for the full amount then due (or more); (c) delivered to the address designated by Lender; (d) in Lender's possession before the applicable Delinquency Date; and (e) honored by the financial institution upon which is drawn the first time it is presented for payment or deposit or otherwise negotiated.

6.2    <u>Delinquency Date</u>. A payment due hereunder shall become delinquent (a "<u>Delinquent Payment</u>") if Lender has not Received the full amount thereof before the fifth (5th) calendar Day after that payment first became due ("<u>Delinquency Date</u>"). Time is of the essence: no Delinquency Date shall be extended because it falls on a non-Business Day, but a payment otherwise Received by the Lender before the applicable Delinquency Date shall not become a Delinquent Payment only because Lender elects to present it for payment on or after the Delinquency Date.

6.3    <u>Repayment</u>. Obligor shall pay to Lender the unpaid principal balance and all other amounts due hereunder no later than the Maturity Date.

6.4    <u>Application of Payment Amounts Received</u>. All payments and prepayments Received by Lender first shall be applied first to Late Charges, then to Interest, and then to the unpaid principal balance.

6.5    <u>Prepayment</u>. At the option of Obligor, the principal amount of the indebtedness evidenced by this Note may be prepaid in whole or in part at any time, with accrued Interest, to the date of such prepayment on the amount prepaid, without penalty or premium and subject to the discount as referenced herein for early payment. In the event Obligor pays off this Note in full on or before _____, 2015 the Note Rate applied for the accrued interest shall be reduced to 4.8%.

7.    <u>Default</u>.

7.1    <u>Events of Default</u>. Separately, each of the following constitutes an independent event of default ("Event of Default"), the occurrence which shall, at the option of Lender and without notice to Obligor, cause all unpaid principal, Interest and late charges under this Note at once to become due and payable, thereby accelerating the Maturity date and rendering all such amount subject to immediate collection, whether or not there has been a prior demand, and without any need to make demand, for payment and regardless of any alternate Maturity Date:

(a)    The appointment, pursuant to an order of a court of competent jurisdiction, or a trustee, receiver, or liquidator of Obligor, or any attachment, execution, or other judicial seizure of all or any substantial portion of Obligor's assets which attachment, execution, or seizure is not discharged within thirty (30) Days.

(b)    If Obligor is enjoined, restrained or in any way prevented by court order from conducting all or a substantial part of its business affairs, and such proceedings or injunction have not been dismissed or stayed within thirty (30) Days from the date of filing of such proceedings or entry of such injunction.

(c)    The filing by or against Obligor of a petition in bankruptcy or for an arrangement or for reorganization or other form of debtor relief pursuant to the federal Bankruptcy Act, as amended or replaced from time to time, o any other law, federal or state, whether now existing or hereafter amended or enacted, relating to insolvency or debtor relief (except in the case of a filing against Obligor, default shall not exist unless Obligor fails to have the proceeding discharged within thirty (30) Days after the filing), or the adjudication of Obligor as bankrupt or insolvent by a decree of a court of competent jurisdiction, or the assignments by Obligor for the benefit of creditors, or the admission by Obligor in writing of its inability to pay its debts generally as they become due, or Obligor's consent to the appointment of a receiver or receivers of all or any part of its property.

(d)     Obligor becomes insolvent or bankrupt, is generally not paying its debts as they become due, or makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for the Obligor or for the greater part of the properties of the Obligor with the consent of the Obligor, or if appointed without the consent of the Obligor, such trustee or receiver is not discharged within thirty (30) Days, or bankruptcy, reorganization, liquidation or similar proceedings are instituted by or against the Obligor are consented to it by Obligor or remain undismissed for thirty (30) Days, or a writ or warrant of attachment or similar process shall be issued against a substantial part of the property of the Obligor and shall not be released or bonded within thirty (30) Days after levy.

(e)     A payment is (i) dishonored by the financial institution upon which is drawn, (ii) made conditionally or (iii) Received by Lender on or after the related Delinquency Date.

(g)     A default by the Obligor in making any payment of principal, Interest, or any other amount payable under this Note when due and/or Lender's non-Receipt of all amounts due hereunder on or before the Maturity Date or Delinquency Date, as applicable.

8.     Late Charge, Default Interest and Remedies.

8.1     Each separate payment of principal or Interest due during the term of this Note or on the Maturity Date including, without limitation, the balloon payment and all accrued Interest and other charges payable no later than the Maturity Date, but not Received by the Lender on or before the Delinquency Date is subject to a one-time, non-recurring late charge due and payable immediately, equal to two percent (2.00%) of the amount delinquent ("Late Charge"). Obligor acknowledges that: (a) under the circumstances existing at the time Obligor signs this Note, it would be extremely difficult and impractical to determine Lender's actual damages resulting from any late payment or default; (b) the Late Charges and default Interest are reasonable estimates of those damages and do not constitute a penalty or forfeiture; and (c) the inclusion of Late Charges and default Interest in this Note were material inducements to Lender to make the Loan.

8.2     Under no circumstances shall Interest accrue, become, or be allowed to become due or be payable at a rate that exceeds the applicable maximum rate of Interest permitted by law to be charged.

8.3     The remedies of Lender in the Note, or at law or in equity, are cumulative and concurrent, and may be pursued singly, successively or together in Lender's discretion.

9.     **Waivers. OBLIGOR AND ALL OTHER PERSONS NOW OR IN THE FUTURE LIABLE ON THIS NOTE KNOWINGLY, VOLUNTARILY, ABSOLUTELY, IRREVOCABLY AND UNCONDITIONALY WAIVE, RENOUNCE AND, TO THE FULLEST EXTENT ALLOWED BY LAW, DISCLAIM ALL RIGHTS WITH RESPECT TO:**

9.1     presentment for payment, demand, notice of demand and of, dishonor and nonpayment of this Note, notice of intention to accelerate the maturity of this Note, protest and notice of protest, diligence in collecting, and the bringing of suit against any other party, and agree to all renewals, extensions, modifications partial payments, or releases of security, in whole or in part, with or without notice, before or after maturity; and

9.2     the benefits of any statute of limitations and any moratorium, reinstatement, marshaling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the Constitution and laws of the United States of America and

of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note. The pleading of any statute of limitations as a defense to an demand against the waived by each and all such parties to the extent permitted by law; and

10.    No Waiver; Amendment. No failure to accelerate the debt evidenced herby by reason of default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (a) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (b) to prevent the exercise of such right of acceleration or any other right granted hereunder or by any applicable laws; and Obligor hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Obligor under this Note, either in whole or in part unless Lender agrees in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

11.    Unconditional Payment. Obligor is obligated to pay principal, Interest, late charges and any and all other amounts which become payable hereunder absolutely and unconditionally ("Unconditional Payment") and without any abatement, and without any reduction for counterclaim or setoff. If, at any time, any payment Received by Lender hereunder is deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Obligor and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

12.    Bankruptcy and Reinstatement. To the maximum extent permitted by law, Obligor agrees that the liability of Obligor under this Note shall in no way be affected by (a) a payment or payments credited for any payment or payments made for the account of or on behalf of Obligor to Lender, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any Bankruptcy, State or Federal Law, common law or equitable cause or otherwise; (b) the release or discharge of Obligor in any creditor proceeding, receivership, bankruptcy or other similar proceeding, (c) the impairment, limitation or modification of the liability of Obligor or of any remedy for the enforcement of Obligor' liability resulting from the operation of any present or future provision of Title 11 of the United States Code, as amended, or any other statute or proceeding affecting creditors' rights generally, (d) the rejection or disaffirmance of Obligor's obligations hereunder or any portion thereof in any such Proceeding, or € the cessation, from any cause whatsoever, whether consensual or by operation of law, of the liability of Obligor to Lender. The obligations of Obligor hereunder shall be revived, reinstated and continued in full force, and the rights of Lender shall continue, with respect to any amount at any time paid on account of Obligor's obligations hereunder, which shall thereafter be required to be restored or returned by Lender upon the bankruptcy, insolvency or reorganization of Obligor, or otherwise all as though such amount had not been paid.

13.    <u>Assignment/Assumption;</u>. This Note is non-assumable. Obligor may not, under any circumstances, assign or delegate all or any of its rights or obligations under the term of this Note; any assignment or assumption or purported assignment or assumption in violation of this Section (an "<u>Unpermitted Transfer</u>") is an Event of Default hereunder. Lender may assign its interest in this Note freely, upon giving notice to Obligor.

14.    <u>Notice</u>. Any notices, payment or other communication required or permitted to be given hereunder shall be given in writing and delivered (a) in person, (b) by certified mail, postage prepaid, return receipt requested, (c) by a commercial overnight courier that guarantees next Business Day delivery and provides a receipt, or (d) by confirmed facsimile or telecopy, if addressed to Lender at the address set forth in the first paragraph hereto and if addressed to Obligor at the address set forth below its name on the signature page hereto, or to such other address as a party may designate from time to time in a written notice to the other party in accordance with the provisions of this Section. Any notice, payment or other communication shall be deemed delivered when actually delivered, if such delivery is in person, upon deposit with the U.S. Postal Service, if such delivery is by certified mail, upon deposit with the overnight courier service, and upon transmission if such delivery is by confirmed facsimile or telecopy during normal business hours of the recipient, or if not, on the next Business Day.

15.    <u>No Offsets</u>. No indebtedness evidenced by this Note shall be offset by all or part of any claim, cause of action, or cross-claim of any kind, whether liquidated or unliquidated, which Obligor now has or may hereafter acquire or allege to have acquired against Lender. To the fullest extent permitted by law and, except in the case of unreasonable claims, Obligor waives the benefits of any applicable law, regulation, or procedure which provides, in substance, that where cross demands for money exist between parties at any point in timewhen neither demand is barred by the applicable statute of limitations, and an action is thereafter commenced by one such party, the other party may assert the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the claim would at the time of filing the response be barred by the applicable statute of limitations.

16.    <u>Attorneys' Fees</u>. In a Proceeding that arises out of or in any way related to this Note or a modification hereof, the prevailing party is entitled to recover its attorneys' fees and costs (whether or not otherwise recoverable) in addition to all other relief it obtains. "<u>Proceeding</u>" means any action, suit, litigation, alternative dispute resolution mechanism, inquiry, hearing, investigation or proceeding of any kind commenced in, transferred to, confirmed by or appealed to a court or tribunal of any kind. The obligations in this Section are independent of an in addition to Obligor's obligation to pay Lender's Transactional Legal Fees as provided herein.

17.    <u>Venue/Trial Forum and Consent to Jurisdiction</u>. Obligor irrevocably agrees that: (a) in connection with any Proceeding, the state courts of Nevada have all necessary subject matter jurisdiction for all purposes of that Proceeding; (b)(i) all state courts in Nevada have all authority necessary to exercise personal jurisdiction over it in connection with any Proceeding and (ii) it knowingly and voluntarily submits and consents to the exercise of such personal jurisdiction over it; (c) venue and the trial forum for any Proceeding arising under this Note shall, ineach case, lie and remain **exclusively** in a Nevada state court in **Clark County**, Nevada; and (d) it will not seek, and waives the rights to (i) assert or join in the assertion of doctrine of *forum non conveniens* or (ii) request, or join in any request for a removal to federal court, change of venue or trial forum transfer. Nothing in this Section shall prevent or limit the enforcement of any judgment entered by a court described in this Section by way of sister state judgment, international Proceeding or as otherwise permitted by law.

18.     Miscellaneous. Subject to all applicable transfer limitations, this Note binds and inures to the benefit of Obligor, Lender and their heirs, executors, legal representatives, successors, successor trustees, and assigns. Subject to all applicable transfer limitations the terms "Obligor" and "Lender" are deemed to include their respective permitted heirs, executors, legal representatives, successors, successor trustees, and assigns, whether by voluntary action or operation of law.

All personal pronouns used herein whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa. Titles of articles and section headings are for convenience only an in no way define, limit, amplify or describe the scope or intent of any provisions hereof. Time is of the essence with respect to all provisions of this Note. "Day" means a calendar day. "Business Day" means each Day that is not a Saturday, Sunday or legal holiday under the laws of the United States or the State of California. No ambiguity in any of the Loan Documents shall be construed in favor or against any party thereto or signer thereof. The Loan Documents contained the entire agreement between the parties hereto and thereto relating to the subject matter hereof and thereof and all prior agreements relative hereto and thereto, which are not contained herein or therein are terminated.

19. Representation. Obligor represents, warrants and agrees: (a) before signing, it had a full and fair opportunity to consult with independent legal, tax and other advisors of its own selection regarding the advisability, significance and effect of all of the Loan Documents including this Note and has done so to the extent it deemed necessary; (b) it has read, considered and understands this Note and all of the other Loan Documents and consents to all of the terms and conditions herein and therein; (c) it executes this Note and the other Loan Documents voluntarily; (d) each person signing below has the right and all authority necessary to sign and deliver this Note; (f) except as expressly set forth in this Note, whether oral or written, express or implied; (g) the express representations, warranties and covenants in this Note and in the other Loan Documents are material and sufficient consideration for its execution of this Note and the other Loan Documents; and (h) the terms and conditions of this Note and the other Loan Documents are fair and reasonable under the circumstances existing as of the Note Date.


IN WITNESS WHEREOF, Obligor has executed this Note as of the Note Date.

**OBLIGOR**


_____

Michael A. Clevenger,

An unmarried man

EXHIBIT A

LIST OF INVESTORS

| Lender Name |
| --- |
| Brenner Revocable Trust DTD 5/12/97 |
| George Zabran  III |
| Integrated Financial Associates |
| LMC Living Trust |
| Michael J. Proto & Helen Proto Revocable Living Trust |
| Mustapha Assi Rev. Living Trust 6/23/03 |
| Patrick M. Rich Trust DTD April 4, 2001 |
| Richard Kropp cust., UGMA Sebastian Kropp |
| Richard Kropp, cust. UGMA Emerson Kropp |
| Richard Kropp, cust. UGMA Remington Kropp |
| Sharon Brashear |
| Skye Enterprises, LLC |
| Stephanie Kropp |
| The 1994 Cisneros Family Trust |
| The Proto Family Trust |
| The Zabran Family Trust |
| VG Revocable Trust |

**EXHIBIT C**

**LOAN SALE AGREEMENT**

# LOAN SALE AGREEMENT

THIS LOAN SALE AGREEMENT (this "**Agreement**") is entered into as of ___May 8___, 2012 (the "**Effective Date**") by and between Integrated Financial Associates Inc., a Nevada corporation ("**Noteholder**"), individually and on behalf of the parties identified on Schedule 1 and Schedule 2, and Regents Gate Investors, LLC, a California limited liability company, as purchaser. ("**Purchaser**")

## Recitals

A.      On June 2, 2006, Golden State Investments II, LP, a California limited partnership, as borrower, executed that certain Promissory Note ("**Note 1**"), payable to the order of the Noteholder, as payee, in the original principal amount of $3,300.000. Noteholder has assigned beneficial interests in Note 1 to the individuals set forth on Schedule 1.

B.      On June 2, 2006, Golden State Investments II, LP, a California limited partnership, Golden State Investments, LP, a California limited partnership, and Pegasus-MH Ventures I, LLC, a California limited liability company, as borrowers, executed that certain Promissory Note ("**Note 2**"), payable to the order of the Noteholder, as payee, in the principal amount of $2,300.000. Noteholder has assigned beneficial interests in Note 2 to the individuals set forth on Schedule 2.

C.      Golden State Investments II, LP, a California limited partnership, Golden State Investments, LP, a California limited partnership, and Pegasus-MH Ventures I, LLC, a California limited liability company shall hereinafter be referred to as "**Borrowers**"

D.      In connection therewith, the Borrowers, as grantor, executed and delivered two Deeds of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the "**Deeds of Trust**"), unto Financial Title Company, Livermore, California as trustee, for the benefit of Noteholder, as beneficiary, recorded on June 5, 2006 as Document Numbers 2006-120307 and 2006-229368, respectively, in the Real Property Records in San Joaquin County, California.  The Deeds of Trust were modified by that certain Modification to Note and Deed of Trust dated August 1, 2007 and recorded on August 6, 2007 as Document Numbers 2007-141428, in the Real Property Records in San Joaquin County, California

D.      Purchaser has requested that Noteholder sell to Purchaser the Loan Documents (defined in Section 1.1 below).  As expressly set forth herein, Noteholder is willing to sell the Loan Documents to Purchaser.

## Agreement

### ARTICLE I
### Property to be Sold

1.1      Included Property.  Noteholder hereby agrees to sell and convey to Purchaser as-is, where-is, without representation, recourse or warranty whatsoever, express or implied, in fact or by law, except for those expressly stated herein, and Purchaser hereby agrees to purchase and acquire from Noteholder, for the consideration hereinafter stated, Noteholder's right, title and interest in and to the documents and items listed in **Schedule "3"**, attached hereto and incorporated herein by reference, and materials relating thereto (collectively, the "**Loan Documents**").

1.2     Excluded Property.  This Agreement does not include (i)any personal property and or rights not included in the Deed of Trust and (ii) causes of actions, current or future litigation rights or other ancillary actions against all parties (other than Original Borrower) for events occurring prior to the Effective Date.

**ARTICLE II**
Purchase Price

2.1     Purchase Price.  The purchase price (the **"Purchase Price"**) to be paid by Purchaser to Noteholder for the Loan Documents is: Six Hundred Thousand and No/100 ($600,000) for Note 1 and Four Hundred Thousand and No/100 Dollars ($400,000) for Note 2.

2.2     Payment of Purchase Price.  The Purchase Price shall be paid by: Michael A Clevenger issuing two personal Promissory Notes in the form attached here to as **Exhibit "C"** on or before Thirty (30) days following Bankruptcy court approval (the **"Closing Date"**).

**ARTICLE III**
Closing

3.1     Closing.  The closing (the **"Closing"**) shall take place on the Closing Date at 10:00 a.m. (PST) with First American Title Insurance Company, Attention: Name  (**"Title Company"** and/or **"Escrow Agent"**)

At Closing, Noteholder will deliver to Purchaser the following:

(a)    The ***original*** Notes, indorsed by allonge as set forth on **Exhibit "B"**, attached hereto and incorporated herein by reference, and all indebtedness associated therewith;

(b)    A photocopy of each of the remaining Loan Documents (originals will be provided, to the extent they are in the actual, physical possession of the Noteholder);

(c)    Transfer of Note and Lien, and UCC-1 in exactly the form set forth hereon at **Exhibit "B"**, attached hereto and incorporated herein by reference.

(d)    An assignment of any UCC-1 filing against any personal property

(e)    A release of the personal guaranty of Michael A Clevenger from all obligations related to Note 1 and Note 2, except as provided in Paragraph 2.1 above

Title Company shall provide to Purchaser, at Purchaser's sole cost, a title endorsement from the Title Company for the assignment of Note 1 and Note 2 to purchaser, and an endorsement of the existing Title policy.

At Closing, Purchaser shall deliver to Noteholder the Purchase Price as described above, plus all fees as required by the Title Company, and the costs of any title endorsements as requested by Purchaser.

## ARTICLE IV
### Information to Purchaser

4.1     Copies of Loan Documents.  Within twenty-four (24) hours following the Effective Date, Noteholder agrees to provide Purchaser with copies of the Loan Documents as identified on Schedule 3. Purchaser and any of Purchaser's agents, representatives, successors or assigns (collectively, "**Purchaser, et al.**") agree to indemnify and hold harmless Noteholder from any damages Noteholder incurs because of Purchaser, et al.'s review of the Loan Documents.

## ARTICLE V
### Representations and Warranties

5.1     Noteholder's Representations and Warranties.  Noteholder represents and warrants to Purchaser the following matters to be correct to the best of Noteholder's current actual knowledge, information and belief:

(a)   The execution, performance and consummation of the transaction completed hereby will not result in the breach of any provision or constitute a default under any indenture, mortgage, deed of trust or other agreement or instrument to which Noteholder is now, or at Closing will be, a party or by which Noteholder is or at Closing will be bound;

(b)   As set forth in NRS§645B.340 and the approval of the majority in interest of the individual investors set forth on Schedules 1 and 2, Noteholder and has full right, power and authority to sell, endorse, assign, transfer and deliver the Loan Documents to Purchaser

5.2     Purchaser's Representations and Warranties.

(a)   The execution, performance and consummation of the transaction completed hereby will not result in the breach of any provision or constitute a default under any indenture, mortgage, deed of trust or other agreement or instrument to which Purchaser is now, or at Closing will be, a party or by which Purchaser is or at Closing will be bound.

(b)   Purchaser has full right, power and authority to purchase, take assignment of and assume liability (for matters originally occurring from and after the Closing Date, but not before the Closing Date) under the Loan Documents.

## ARTICLE VI
### Defaults

6.1     Purchaser's Default; Noteholder's Remedies.  Upon the failure of Purchaser to complete the purchase as specified herein, Noteholder shall be entitled to pursue all remedies available at law or in equity.

6.2     Noteholder's Default; Purchaser's Remedies.  Upon the failure of Noteholder to complete this sale in accordance with the terms hereof, Purchaser shall be entitled to enforce specific performance of this Agreement against Noteholder.  Purchaser shall have all rights available at law or in equity as provided in California

**ARTICLE VII**
Severability

7.1    Severability.  If any provision of this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect for any reason, the invalidity, illegality or unenforceability of such specific provision herein shall not be held to invalidate any other provision herein, and the remainder of this Agreement shall remain in full force and effect.

**ARTICLE VIII**
Costs and Expenses

8.1    Costs and Expenses.  Each party shall pay for its own costs and expenses incurred herein. In the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and court costs through all trial and appellate levels. The provisions of this Subsection shall survive Closing and any termination or cancellation of this Agreement.

**ARTICLE IX**
Assignment

9.1    No Assignment.  Purchaser or Noteholder shall not have the right or authority to assign any or all of its rights and obligations pursuant to this Agreement;

**ARTICLE X**
Indemnification

10.1    Purchaser's Indemnification & Release.  Purchaser agrees to indemnify, hold harmless and defend Noteholder and all Direct Lenders set forth on Schedule 1 and Schedule 2 (collectively, the "**Indemnified Parties**"), and each of them, from and against any and all losses, causes of action, liabilities, claims, demands, obligations, damages, costs and expenses, including reasonable attorneys' and accountants' fees and costs, to which any of the Indemnified Parties may become subject on account of, arising out or related to this transaction. Purchaser agrees to release the Indemnified Parties for all causes of actions, losses, liabilities, claims, demands, obligations, damages, costs and expenses for which Purchaser may now or hereafter have against the Indemnified Parties.

**ARTICLE XI**
Miscellaneous Provisions

11.1    Time is of the Essence.  Time is of the essence in this Agreement.

11.2    Parties Bound.  The terms and provisions of this agreement shall inure to, intend to and be of the benefit of the heirs, successors, assigns and legal representatives of the respective parties hereto.

11.3    Notices.  Any notices required or permitted to be given under this Agreement shall be in writing and shall be deemed given if delivered by hand, sent by recognized overnight courier (such as Fed Ex), transmitted via facsimile transmission, email or mailed by certified or registered mail, return receipt requested, in a postage prepaid envelope, and addressed as follows:

| To Purchaser | To Noteholder |
|---|---|
| Regents Gate Investors, LLC | Integrated Financial Associates Inc . |
| 390 Railroad Ave | 3311 S. Rainbow Blvd. |
| Suite 201 | Suite 209 |
| Danville CA 94526 | Las Vegas NV 89146 |
| Attn: Michael Clevenger | Attn: Bill Dyer |
| 925-552-5900 – telephone | (702) 257-0021 – telephone |
| 925-552-5901 - telecopy | (702) 257-0031 – telecopy |
| Mclevenger@pegasusdevelopment.net | bill_ifa@yahoo.com |

Either Party may periodically change any address to which notice is to be given it by providing written notice of such change to the other Party.

Notices personally delivered or sent by overnight courier shall be deemed given on the date of receipt, notices sent via email shall be deemed given upon transmission, notices sent via facsimile transmission shall be deemed given upon transmission and confirmation of receipt and notices sent via certified mail in accordance with the foregoing shall be deemed given when delivered (whether accepted or refused) as established by the U.S. Postal Service return receipt.

11.4    ENTIRE AGREEMENT.  THIS AGREEMENT CONSTITUTES THE ENTIRE, SOLE AND ONLY AGREEMENT OF NOTEHOLDER AND PURCHASER HERETO, EXCEPT AS OTHERWISE PROVIDED FOR HEREIN, AND SUPERSEDES ANY PRIOR UNDERSTANDING OR WRITTEN OR ORAL AGREEMENTS BETWEEN THE PARTIES RESPECTING THE SUBJECT MATTER OF THIS AGREEMENT.  THIS AGREEMENT MAY NOT BE CHANGED EXCEPT BY WRITTEN AGREEMENT DULY EXECUTED BY NOTEHOLDER AND PURCHASER.

11.5    Captions.   The headings in this Agreement have been used for administrative convenience only and shall not be used in interpreting or construing the meaning of any provision in this Agreement.

11.6    Governing Law  This confidentiality agreement shall be governed by and construed in accordance with the laws of the state of Nevada.  The parties agree that any action or proceeding arising out of or related in any way to this agreement shall be brought solely in a court of competent jurisdiction sitting in the state of Nevada, county of Clark.  The parties hereby irrevocably and unconditionally consent to the jurisdiction of any such court and hereby irrevocably and unconditionally waive any defense of an inconvenient forum to the maintenance of any action or proceeding in any such court, any objection to venue with respect to any such action or proceeding and any right of jurisdiction on account of the place of residence or domicile of any party thereto.

11.6    Counterpart; Facsimile Signature.   Facsimile signatures appearing hereon shall be deemed an original and this Agreement may be executed simultaneously on two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute one (1) and the same instrument.

11.7    Court Approval. The parties acknowledge that this Agreement shall only become valid and binding upon final approval by the United States Bankruptcy Court in IFA's bankruptcy Case No. 11-13537 in the District of Nevada.  As soon as practicable, IFA shall file such motions as are required in order to obtain the Court's approval of this Agreement.

**SCHEDULES / EXHIBITS:**

| | | |
|---|---|---|
| **Schedule "1"** | - | List of Direct Lenders in Note 1 |
| **Schedule "1"** | - | List of Direct Lenders in Note 2 |
| **Schedule "3"** | - | Loan Documents |
| | | |
| **Exhibit "A"** | - | Allonge |
| **Exhibit "B"** | - | Transfer of Note and Lien |
| **Exhibit "C"** | - | Promissory Note issued by Michael A Clevenger |

EXECUTED to be effective as of the Effective Date.

**NOTEHOLDER:**

Integrated Financial Associates Inc  .
A Nevada Corporation

By: _____
Name :     William Dyer
Title:     Manager _President_
Date:_____5/9/2012_____

**PURCHASER:**

REGENTS GATE INVESTORS, LLC
a California limited liability company

By: _____
Name:     Michael A Clevenger
Title:     Member – Manager
Date:_____MAy 8, 2012_____

## Schedule "1"

### List of Direct Lenders

(Attach List of all Direct Lenders in Note 1)

# Schedule "2"

## List of Direct Lenders

(Attach List of all Direct Lenders in Note 2)

## Schedule "3"

### Golden State Investments II, LP Loan Documents

1. Promissory Note Secured by Deed of Trust in the amount of $3,300,000, dated June 2, 2006
2. Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, dated June 2, 2006
3. Modification to Note and Deed of Trust dated as of August 1, 2007
4. Guaranty- Michael A Clevenger dated June 2, 2006

### Golden State Investments, LP,  Golden State Investments II , LP , and Pegasus-MH Ventures I, LLC Loan Documents

5. Promissory Note Secured by Deed of Trust in the original amount of $1,750,000, dated June 2, 2006
6. Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, dated June 2, 2006
7. Modification to Note and Deed of Trust dated as of August 1, 2007
8. Guaranty- Michael A Clevenger dated June 2, 2006

# EXHIBIT "A"

Allonge

## ALLONGE

_____, 2012

       Allonge to Promissory Note (the "**Note**"), dated _____, executed by _____, as maker, payable to the order of _____, as payee, in the original principal amount of $_____. The Note is hereby transferred pursuant to the following endorsement with the same force and effect as if such endorsement were set forth at the end of the Note:

             Pay to the order of _____, **AS-IS, WHERE-IS, WITHOUT REPRESENTATION, RECOURSE OR WARRANTY, EXPRESS OR IMPLIED, IN FACT OR BY LAW.**

       This Allonge shall be "affixed" to the Note and is hereby made a part thereof.

       NOTEHOLDER:

       Integrated Financial Associates Inc .
       A Nevada Corporation

       By: _____
       Name :     William Dyer
       Title:       President
       Date:_____

# EXHIBIT "B"

### TRANSFER OF NOTES AND LIEN

_____, 2012 (the **"Effective Date"**)

STATE OF _____    §
                       §
COUNTY OF _____    §

THIS TRANSFER OF NOTES AND LIEN (this **"Transfer"**) is entered into by and between Integrated Financial Associates, Inc., individually and as agent for the parties who are specified on Schedule 1 and Schedule 2, pursuant to NRS§645B.340 and other Power of Attorney of executed by more than 51% of the direct lenders set forth on Schedule 1 and Schedule 2 (**"Noteholder"**), as noteholder, and REGENTS GATE INVESTORS, LLC (**"Purchaser"**), as purchaser.

### Recitals

A.      On June 2, 2006, Golden State Investments II, LP, a California limited partnership, as borrower, executed that certain Promissory Note (**"Note 1"**), payable to the order of the Noteholder, as payee, in the original principal amount of $3,300.000. Noteholder has assigned beneficial interests in Note 1 to the individuals set forth on Schedule 1.

B.      On June 2, 2006, Golden State Investments II, LP, a California limited partnership, Golden State Investments, LP, a California limited partnership, and Pegasus-MH Ventures I, LLC, a California limited liability company, as borrowers, executed that certain Promissory Note (**"Note 2"**), payable to the order of the Noteholder, as payee, in the principal amount of $2,300.000. Noteholder has assigned beneficial interests in Note 2 to the individuals set forth on Schedule 2.

C.      Golden State Investments II, LP, a California limited partnership, Golden State Investments, LP, a California limited partnership, and Pegasus-MH Ventures I, LLC, a California limited liability company shall hereinafter be referred to as **"Borrowers"**.

D.      In connection therewith, the Borrowers, as grantor, executed and delivered two Deeds of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the **"Deeds of Trust"**), unto Financial Title Company, Livermore, California as trustee, for the benefit of Noteholder, as beneficiary, recorded on June 5, 2006 as Document Numbers 2006-120307 and 2006-229368, respectively, in the Real Property Records in San Joaquin County, California. The Deeds of Trust were modified by that certain Modification to Note and Deed of Trust dated August 1, 2007 and recorded on August 6, 2007 as Document Numbers 2007-141428, in the Real Property Records in San Joaquin County, California

E.      Purchaser has requested that Noteholder sell to Purchaser the Loan Documents (defined in the Loan Sale Agreement). As expressly set forth herein, Noteholder is willing to sell the Loan Documents to Purchaser.

### Agreement

NOW, THEREFORE, for and in consideration and the sum of Ten Dollars, ($10.00), the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, Noteholder hereby transfers, conveys, assigns, sells, sets

over and delivers unto Purchaser the Loan Documents; pursuant to the terms and provisions contained within the Loan Sale Agreement.

IN WITNESS WHEREOF, Noteholder and Purchaser execute this Transfer to be effective as of the Effective Date.

NOTEHOLDER:

Integrated Financial Associates Inc .
A Nevada Corporation

By:
Name :          William Dyer
Title:            Presdient
Date:_____

PURCHASER:

REGENTS GATE INVESTORS, LLC
a California limited liability company

By:
Name:    Michael A Clevenger
Title:     Member – Manager
Date:_____

STATE OF _____          §
                              §
COUNTY OF _____          §

       This instrument was acknowledged before me on this _____ day of _____, 2012, by _____, _____ of Integrated Financial Associates, Inc., individually and as agent for the parties who are specified on Schedule 1 and Schedule 2, pursuant to NRS §645B.340 and other Power of Attorneys executed by more than 51% of the direct lenders set forth on Schedule 1 and Schedule 2.

                                        _____
                                        Notary Public in and for the State of _____
                                        My Commission Expires:_____
                                        Printed Name:_____

STATE OF _____          §
                              §
COUNTY OF _____          §

       This instrument was acknowledged before me on this _____ day of _____, 2012, by _____, the _____ of _____, a _____, on behalf of said entity.

                                        _____
                                        Notary Public in and for the State of _____
                                        My Commission Expires:_____
                                        Printed Name:_____

# Schedule "1"

<u>List of Direct Lenders</u>

(Attach List of all Direct Lenders in Note 1)

## Schedule "2"

List of Direct Lenders

(Attach List of all Direct Lenders in Note 2)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

## INVESTOR DISTRIBUTIONS

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Settlement (Clevenger)\Mot Appr Stlmt Clevenger 070912.wpd                - 11 -

**LOAN FUNDING**
**26-020-GOLDEN STATE INVESTMENTS, LP & PEGASUS-MH VENTURES I, LLC**

| Lender Name | Pct Owned | Principal Balance | Settlement w/o Accrued Interest |
|---|---|---|---|
| Integrated Financial Associates | 39.268% | $903,163.27 | $157,071.87 |
| Integrated Financial Associates | 1.087% | $25,000.00 | $4,347.83 |
| The Zabran Family Trust | 10.870% | $250,000.00 | $43,478.26 |
| Mustapha Assi Rev. Living Trust 6/23/03 | 14.130% | $325,000.00 | $56,521.74 |
| Stephanie Kropp | 2.174% | $50,000.00 | $8,695.65 |
| Patrick M. Rich Trust DTD April 4, 2001 | 3.261% | $75,000.00 | $13,043.48 |
| Michael J. Proto & Helen Proto Revocable Living Trust | 1.087% | $25,000.00 | $4,347.83 |
| The 1994 Cisneros Family Trust | 4.348% | $100,000.00 | $17,391.30 |
| VG Revocable Trust | 4.645% | $106,836.73 | $18,580.30 |
| George Zabran  III | 3.261% | $75,000.00 | $13,043.48 |
| LMC Living Trust | 1.739% | $40,000.00 | $6,956.52 |
| Richard Kropp cust., UGMA Sebastian Kropp | 2.174% | $50,000.00 | $8,695.65 |
| Richard Kropp, cust. UGMA Remington Kropp | 2.174% | $50,000.00 | $8,695.65 |
| Richard Kropp, cust. UGMA Emerson Kropp | 2.174% | $50,000.00 | $8,695.65 |
| Skye Enterprises, LLC | 2.174% | $50,000.00 | $8,695.65 |
| The Proto Family Trust | 1.087% | $25,000.00 | $4,347.83 |
| Sharon Brashear | 2.174% | $50,000.00 | $8,695.65 |
| Brenner Revocable Trust DTD 5/12/97 | 2.174% | $50,000.00 | $8,695.65 |
| | 100.000% | $2,300,000.00 | $400,000.00 |

**LOAN FUNDING**
**26-019-GOLDEN STATE INVESTMENTS II, LP**

| Lender Name | Pct Owned | Principal Balance | Settlement w/o Accrued Interest |
|---|---|---|---|
| Integrated Financial Associates | 0.061% | $2,000 | $363.64 |
| TGA, L.L.C. | 10.000% | $330,000 | $60,000.00 |
| JA Kretsch Financial Retirement Plan | 1.909% | $63,000 | $11,454.55 |
| SCWAK, LLC | 4.545% | $150,000 | $27,272.73 |
| Rick Templeton | 5.303% | $175,000 | $31,818.18 |
| Kalb Construction Co. Profit Sharing Plan | 4.545% | $150,000 | $27,272.73 |
| Mark Heese | 9.091% | $300,000 | $54,545.45 |
| Bobi J. Templeton Family Trust | 1.515% | $50,000 | $9,090.91 |
| TD3 Trust | 3.030% | $100,000 | $18,181.82 |
| The Meritage Trust | 7.576% | $250,000 | $45,454.55 |
| Ruth Oshins Revocable Family Trust | 1.515% | $50,000 | $9,090.91 |
| Glenn Raynes & Rene M. Raynes Revocable Family Trust | 10.000% | $330,000 | $60,000.00 |
| George & Adela Smith Family Trust DTD 9/14/98 | 1.515% | $50,000 | $9,090.91 |
| The 1994 Cisneros Family Trust | 6.061% | $200,000 | $36,363.64 |
| Brown Family Trust DTD 11/21/86 | 3.030% | $100,000 | $18,181.82 |
| George D. Kalb & Barbara A. Kalb Rev. Family Trust | 6.061% | $200,000 | $36,363.64 |
| Jon A. Griffin Sr. & Judy A. Griffin Revocable Trust | 1.515% | $50,000 | $9,090.91 |
| Don and Carol Smith | 3.030% | $100,000 | $18,181.82 |
| Karen A. Camp | 1.515% | $50,000 | $9,090.91 |
| The Ruth D. Miille Living Trust | 3.030% | $100,000 | $18,181.82 |
| Nancy Lee W. Fiddyment Revocable Trust | 3.030% | $100,000 | $18,181.82 |
| Nadie Meland & Micki Esken Living Trust | 3.030% | $100,000 | $18,181.82 |
| Hilary J. Kalb Trust | 1.515% | $50,000 | $9,090.91 |
| Pravin P. Bakrania and Veena P. Bakrania Living Trust | 4.545% | $150,000 | $27,272.73 |
| Pravin P. Bakrania and Veena P. Bakrania Living Trust | 3.030% | $100,000 | $18,181.82 |
| | 100.000% | $3,300,000 | $600,000.00 |