1  ALAN R. SMITH, ESQ.
Nevada Bar No. 1449
2  Law Offices of Alan R. Smith
505 Ridge Street
3  Reno, Nevada 89501
Telephone (775) 786-4579
4  Facsimile (775) 786-3066
*Email: mail@asmithlaw.com*
5
Attorney for Debtor
6

*ELECTRONICALLY FILED*
*August 5, 2013*

7
8                    UNITED STATES BANKRUPTCY COURT
9                         DISTRICT OF NEVADA
10                             —ooOoo—
11  In Re:                              Case No. BK-S-11-13537-LBR
                                        Chapter 11
12  INTEGRATED FINANCIAL
ASSOCIATES, INC., a Nevada          **DEBTOR'S POST-TRIAL BRIEF IN**
13  corporation,                        **SUPPORT OF CONFIRMATION OF**
                                        **DEBTOR'S FOURTH AMENDED**
14                                      **PLAN OF REORGANIZATION**
                   Debtor.
15                                      Date:  August 20, 2013
                                        Time: 1:30 p.m.
16                                      Ctrm:  1
                                        Judge: Honorable Linda B. Riegle
17  _____/

18        Debtor, INTEGRATED FINANCIAL ASSOCIATES, INC., a Nevada corporation,

19  by and through its counsel, Alan R. Smith, Esq., of the Law Offices of Alan R. Smith, hereby

20  submits the following brief in support of confirmation of Debtor's Fourth Amended Plan Of

21  Reorganization (the "Plan"). This brief is based upon the following points and authorities.

22                        **POINTS AND AUTHORITIES**

23        **1.     The Creditors Have Voted Overwhelmingly In Favor Of The Plan.**

24        The Certificate of Acceptance And Rejection Of Chapter 11 Plan [Ballot Summary]

25  (the "Ballot Summary") shows the Debtor received a favorable vote from the Bank of

26  Nevada for its Unsecured Claim (Class 2). Class 1 did not vote, but has filed a late

27  acceptance. Class 3 was withdrawn. Within Class 4, out of the 98 Unsecured Creditors that

28

Law Offices of
**ALAN R. SMITH**
**505 Ridge Street**
**Reno, Nevada  89501**
(775) 786-4579

were listed on Debtor's schedules or that filed proofs of claim (including claims subject to objection) the Ballot Summary shows 85 accepting votes, and 4 rejecting votes. The Debtor has settled its disputed claim with MB-BONA, which has agreed to change its vote to an acceptance. An executed settlement agreement has been entered on the Docket [DE 1774]. Accordingly, of the 89 votes received, 86 (97% by number) of the Unsecured Creditors voted to accept the Plan. Only the Mustapha Assi Revocable Trust dated June 23, 2003 (the "Assi Trust"), Mary Pusateri and Paul Pusateri (4.3% by number) voted against the Plan. Even giving the Assi Trust full value ($5,573,046) for its disputed claim, by dollar amount, 78.7% of the Class 4 creditors that voted, accepted the Plan.

**2.      Good Faith Of The Debtor.**

As set forth in Debtor's Omnibus Reply To Objections To Confirmation Of Debtor's Fourth Amended Plan Of Reorganization And Points And Authorities In Support Of Plan Confirmation [DE 1714], the Debtor has satisfied all of the requirements for confirmation. The primary factual issue before the Court on confirmation was good faith, with emphasis on the good faith and fairness regarding the Insider Settlement.

Section 1129(a)(3) states that the Bankruptcy Court shall confirm a plan if the plan has been proposed in good faith and not by any means forbidden by law. *See* In re Boulders on the River, Inc., 164 B.R. 99, 103 (9th Cir. BAP 1994). A Chapter 11 plan is proposed in good faith, when it achieves a result consistent with objectives and purposes of the Bankruptcy Code. In re Sylmar Plaza LP, 314 F.3d 1070, 1074 (9th Cir. 2002) ("Sylmar Plaza"). The Court should consider the totality of the circumstances on a case-by-case basis, taking into account the particular features of each plan. In re Sylmar Plaza, *supra*, at 1075. In its assessment, the court should keep in mind that the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start. In re W.R. Grace & Co., 2012 U.S. Dist. LEXIS 11289 (D. Del. 2012); In re T-H New Orleans LP, 116 F.3d 790, 802 (5th Cir. 1997). The Supreme Court has identified two purposes of Chapter 11: (1) preserving

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd

2

1  going concerns, and (2) maximizing property available to satisfy creditors. <u>Bank of Am. Ntl.</u>

2  <u>Trust & Sav. Ass'n v. 203 La Salle St. Ptship.</u>, 526 U.S. 434, 453 (1999).

3      When considering whether there is a reasonable likelihood that a plan will achieve a

4  result consistent with the Bankruptcy Code, courts focus on good faith in terms of the plan

5  itself, despite whether or not certain activities occurred prior to, or even after, the petition

6  date.  For example, in <u>In re Tex. Extrusion Corp.</u>, 68 B.R. 712, 723 (N.D. Tex. 1986), aff'd

7  836 F.2d 217 (5th Cir. 1988), the debtors objected to the lender's plan, asserting that they had

8  presented a *prima facie* case that the plan was proposed in violation of antitrust laws because

9  of acts committed prior to the bankruptcy filing.  The court rejected these arguments and

10  found the test for good faith should not consider the plan proponents' behavior prior to

11  petition because that was not relevant to the plan.  <u>Tex Extrusion</u>, 68 B.R. at 723.  Rather,

12  the test for good faith is based on the plan itself and whether there is a reasonable likelihood

13  that the plan will achieve a result consistent with the standards under Section 1129.  <u>Id.</u>

14  (Citing <u>In re Cyr Bros. Meat Packing, Inc.</u>, 2 B.R. 620, 626 n.24 (Bankr. D. Maine 1980); *Cf.*

15  <u>In re Alaskan Adventure Tours, Inc.</u>, A10-00282-DMD, 2010 WL 7920613, at *5 (Bankr.

16  D. Alaska Nov. 17, 2010) (noting that pre-petition conduct is part of the "totality of the

17  circumstances").

18      As set forth below, the Plan has been prepared in good faith because "it achieves a

19  result consistent with objectives and purposes of the Bankruptcy Code." <u>In re Sylmar Plaza</u>

20  <u>LP</u>, *supra*.  The Debtor's pre-petition actions, however, bear mentioning.  The Assi Trust

21  failed to prove its wild and overstated accusations, which turned out not to be "shocking,"

22  were unsupported by the evidence, and were downright false.  According to the testimony

23  of William Dyer, the Debtor always:

24      1.    Provided a solicitation properly identifying all relevant factors related to a loan

25          to all potential purchasers of fractionalized interests in deeds of trust.  The

26          solicitations provided to the Assi Trust (Exhibits 6, 11, 30, 34, 38, 42, 56, 60,

27

28

**Law Offices of**
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd    - 3 -

64, 68, 72 and 76 in the Assi claim objection hearing) clearly identified all the aspects and risks associated with each investment.[1]

2.    Obtained signed Loan Servicing Agreements from each investor in each deed of trust loan, that clearly identified the amount of the investor's interest in the loan and the lien priority of his/her investment. *See* Exhibits 8, 14, 31, 36, 40, 49, 58, 62, 66, 70, 74 and 77 in the Assi claim objection hearing for the Loan Servicing Agreements executed by the Assi Trust and delivered to the Debtor.

3.    Provided a Private Placement Memorandum ("PPM") and received an executed Subscription Agreement from all individuals that loaned money to IFA Capital, Inc. The Subscription Agreement confirmed that the individual investor had received, read, and understood the information contained in the PPM. The PPM identified the numerous risks associated with the investment, including the risks of recession, a potential IFA bankruptcy, the impact of a

---

[1]The Debtor requests that the Court take judicial notice of the exhibits introduced in connection with the objection to the claim of the Assi Trust. Whether a court may take judicial notice of a document is governed by Rule 201 of the Federal Rules of Evidence, which provides, in relevant part, that:

(b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) When Discretionary. A court may take judicial notice, whether requested or not.

(d) When Mandatory. A court shall take judicial notice if requested by a party and supplied with the necessary information.

It is appropriate to take judicial notice of matters that are capable of accurate and ready determination by resort to official court files that cannot be reasonably questioned, such as the subject of the present request. Fed.R.Evid. 201(b). Moreover, a bankruptcy court, "may take notice of proceedings of other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *See* Bennett v. Medtronic, Inc., 285 F.3d 801, 803 n. 2 (9th Cir. 2002) (*quoting* United States ex rel. Robinson Rancheria Citizens Council v. Borneo, 971 F.2d 244, 248 (9th Cir. 1992)). The referenced exhibits are relevant to the Assi Trust's objections to the Debtor's Plan.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd

- 4 -

default by the borrowers on deeds of trust, and the potential changes in general economic conditions, among others.

4.     Provided monthly account statements to all IFA Capital investors and regular updates to all investors in deeds of trust originated by the Debtor.

5.     Obtained executed individual power of attorney forms from all investors in fractionalized interests in deed of trust.

6.     Obtained consents from a majority of the loan investors in deeds of trust prior to foreclosing upon any property.

7.     Thoroughly analyzed the process of formation of limited liability companies or limited partnerships to hold title to properties upon foreclosure, and obtained written consent from a majority of the loan investors to do so. The transfer of title to a limited liability company or limited partnership was necessary to manage the properties, to protect the individual investors from personal risks associated with owning real property as a tenant in common and to protect the properties from pending tax foreclosure sales.

8.     Properly managed its bank accounts, and never commingled trust funds.

Despite the existence of the Official Unsecured Creditors Committee (the "Committee"), the United States Trustee, the Examiner, over 700 individual investors in deeds of trust originated by the Debtor, and the creditors, the Debtor never received a formal complaint concerning the Debtor's operations (other than the complaints filed by the Assi Trust). This was a well managed mortgage company that was simply caught by the sudden and dramatic decline in the economy and real estate values. The Plan is proposed in good faith, and offers the most fair and reasonable result possible for all creditors.

///

///

///

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd

- 5 -

### 3.    The Settlement With The Insiders Is Fair.

#### A.    Background.

One aspect of considering the overall fairness of the Plan is the fairness of the settlement with the Insiders (the "Insider Settlement").  The Court expressed concern about the fairness of the Insider Settlement when it *sua sponte* appointed a Chapter 11 Trustee on February 13, 2013 (*see* Order Re Appointment Of Chapter 11 Trustee, [DE 1281]), and when it appointed an Examiner (*see* Order Granting Motion To Modify Order Re Appointment Of Trustee; To Appoint An Examiner In Place Of The Trustee And To Discharge The Trustee [DE 1483]).  Richard Kipperman was appointed as the Chapter 11 Trustee, and subsequently was appointed as the Examiner, in both instances tasked with the duty of providing an independent analysis of the fairness of the Insider Settlement.  Ultimately Mr. Kipperman filed the Examiner's Final Report on June 17, 2013 (the "Examiner's Report"), that provided his analysis of the Insider Settlement.  *See* Exhibit "Q" to the Disclosure Statement

To address the Court's concerns, the Debtor retained the services of an independent real estate brokerage firm to value the assets the Debtor owns and/or manages, a significant aspect in determining the fairness of the Insider Settlement.  Upon the Examiner's recommendation, and with approval of other counsel in the case, the Debtor employed Sperry VanNess to provide a valuation of the various properties the Debtor owns or manages, or holds a percentage interest in a deed of trust or Special Purpose Entity ("SPE").  Because a significant portion of the value of the Debtor's business included accrued loan servicing fees and management fees, as well as fractionalized interests in deeds of trust and SPEs, the Debtor also employed Development Specialists, Inc. ("DSI") to provide a comprehensive independent valuation of the Debtor's business, which included the real property valuations compiled by Sperry VanNess.  The employment of DSI was approved by the Examiner, as well as other counsel appearing in the case.  DSI completed its Asset Analysis dated June 11, 2013, which is attached as Exhibit "P" to the Disclosure Statement.  The significance of the DSI report is discussed below.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd    - 6 -

Prior to the employment of Sperry VanNess and DSI, the Debtor had prepared its own analysis of the value of the Debtor's ongoing business, which is attached as Exhibit "K" to the Disclosure Statement.  It is important to note that the Debtor provided values that were $15 million <u>higher</u> than the property valuations prepared by Sperry VanNess.  In addition, on Exhibit "5" of the analysis prepared by DSI, it assumed an additional $1,284,000 in fee income to the Debtor for the period from December 31, 2012 (the date of the estimation used in Exhibit "K") through the "Estimated Sale Dates" (in many cases an additional 19 months of income) for the various assets, which, if added to the Debtor's values on Exhibit "K", resulted in a virtually identical recovery to that projected by DSI's "Likely Estimated Recoveries."

Under the Plan, unsecured creditors were provided with the option of "cashing out," whereby they would receive a cash settlement of approximately 15% of their claim, or "opting-in," which would allow them to participate in post-confirmation recoveries received by the Debtor relative to collections on the Debtor's pre-confirmation assets.  As the Debtor understands it, the Court's concern was, since the Insiders would end up owning the assets of the reorganized Debtor, and the creditors are waiving their potential claim against the Insiders, were the Insiders paying a fair price?  As more fully discussed below, the answer is most definitely "yes."

**B.    Legal Basis For Analysis.**

The Plan and the Insider Settlement are interdependent.  Good faith under the Plan includes, among other things, fairness of the Insider Settlement.  Although cited so often it has become ubiquitous, the standards set forth in <u>In re A & C Properties</u>, 784 F.2d 1377, 1380-81 (9th Cir. 1986), regarding the fairness of a settlement are particularly applicable here. The standards are:

1.    The probability of success in the litigation;

2.    The difficulties, if any, to be encountered in the matter of collection;

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd    7

3.    The complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it;

4.    The interest of the creditors and a proper deference to their reasonable views in the premises, which is considered paramount.

This Plan, and the Insider Settlement, resolves complex issues, requiring a holistic analysis of various aspects, which are addressed below. Compromises are favored in bankruptcy because they avoid expenses and burdens associated with litigation. A & C Properties, 724 F.2d at 1381. The bankruptcy court has "great latitude" in approving compromises and settlements. Woodson v. Woodson, 839 F.2d 610, 620 (9th Cir. 1988).

### C.    The Probability Of Success In The Litigation.

The Examiner's Report provided a detailed analysis of the likelihood of recovery as well as the estimated amount of the recovery of potential litigation against the Insiders and others. The Examiner believes that certain transfers made to certain Insiders are recoverable, and that other transfers may be recoverable against third parties. The transfers to the Insiders which the Examiner believes are recoverable occurred in 2007 and 2008, and the testimony was that those transfers equaled the taxes on the "pass through" income of IFA for those years, which amounts were paid to the owners since IFA is a S Corporation. However, the only method of recovering those transfers as being fraudulent depends upon proving that the Debtor was insolvent as of April 15, 2007. The Examiner's Report acknowledges that insolvency is an essential prerequisite to recovery of the transfers to the Insiders. See, e.g., page 19, ll. 5-6, p. 18, ll. 2-3, p. 20, ll. 1-2 and 20-26, and p. 22, ll. 8-9.

The Examiner's Report discusses the Debtor's insolvency on pages 7-8. The Examiner relies upon one analysis that applies an improper insolvency test. See p. 7, ll. 8-9. The analysis is not attached to the Examiner's Report, but is apparently based upon a report prepared by Dustin Lewis of LL Bradford, the accounting firm retained by the Committee. Mr. Lewis testified that his test of insolvency was that the Debtor failed to maintain a 20% "debt coverage ratio," which is an accounting, not legal, methodology for determining

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd

- 8 -

1    solvency.[2]  This is not the proper test of insolvency under 11 U.S.C. § 548 and NRS 112.160,

2    both of which require insolvency to be determined based upon a balance sheet approach.

3         11 U.S.C. § 101(32)(A) defines the term "insolvent" to mean:

4         (A) with reference to an entity other than a partnership or municipality, financial
          condition such that the sum of such entity's debts is greater than all of such entity's
5         property, at a fair valuation, exclusive of --

6              (i) property transferred, concealed, or removed with intent to hinder, delay, or
               defraud such entity's creditors; and
7
               (ii) property that may be exempted from property of the estate under section
8              522 of this title;

9    See also, 2-101 Collier on Bankruptcy P 101.32 (16th ed.).  Therefore, according to 11 U.S.C.

10   § 101(32)(A), a rough balance sheet determines insolvency, not whether the debtor has a 20%

11   Debt Service Ratio or is paying its debts on time.  As made clear by the Bankruptcy Code,

12   the debtor is insolvent when all its liabilities exceed the fair value of its nonexempt assets.

13   H.R. Rep. No. 595, 95th Cong. 1st Sess. 1977, 312 (1977) ("An entity is insolvent if its debts

14   are greater than its assets, at a fair valuation, exclusive of property exempted or fraudulently

15   transferred.  It is the traditional bankruptcy balance test of insolvency.").  See also, Briden

16   v. Foley, 776 F.2d 379, 382 (1st Cir. 1985); Wolkowitz v. American Research Corp. (In re

17   DAK Indus.), 170 F.3d 1197, 1200 (9th Cir. 1999) ("fair valuation of debtors assets must

18   begin with a determination of whether a debtor  is a 'going concern' and end with the

19   application of a balance sheet test to determine solvency").  The Ninth Circuit has held that

20   the inability to pay debts in the ordinary course of business is **not** evidence of insolvency.

21   See Akers v. Koubourlis (In re Koubourlis), 869 F.2d 1319, 1322 (9th Cir. 1989).

22        The Examiner also presumes insolvency because 13 of the Debtor's loans were in

23   default by the end of 2007, and that "[T]he Debtor's balance sheets for 2007 and 2008 do not

24   appear to accurately account for the depressed values of real property held by the Debtor, the

25   depressed values of real property securing the Debtor's loans, and the extent of "bad loans"

26

27        [2]References to testimony are based upon notes of Debtor's counsel, and not actual
28   transcripts.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd        - 9 -

1   for which the principal balance was not, or is unlikely to be, paid in full." Examiner's

2   Report, p. 8, ll. 1-4.  However, the Debtor introduced its audited balance sheets for 2006-

3   2007 (Exhibit "27"), as well as the balance sheet for 2008 (Exhibit "28"), both of which were

4   prepared by the Debtor's long-time accountants, Ovist & Howard.  William Dyer testified

5   that the balance sheets were accurate, and that other than the write-down of $3.7 million

6   taken in 2007, real property values had not decreased significantly as of the end of 2008.  Mr.

7   Brad Sharp of DSI also testified that, although the market had slowed down, real property

8   values had not decreased significantly as of the end of 2008.  Mr. Dyer further testified that

9   it was the Debtor's regular business practice to renew or extend loans as long as the property

10  values were increasing, the projects were proceeding as expected, and there were no negative

11  circumstances that would affect the potential for an ensuing pay off.  Virtually every loan in

12  the Debtor's portfolio was originated at 55%-65% loan to value ratio, therefore property

13  values would have had to decrease substantially in order for the Debtor's fractionalized

14  interests to suffer a loss.  Mr. Dyer explained that this simply did not occur prior to the end

15  of 2008.   Finally, Mr. Dyer testified that in 2007 the Debtor had positive cash flow from

16  operating activities of over $3.9 million (*see* p.6 "Statement of Cash Flows" of Exhibit "27.")

17        The Examiner's Report concerning insolvency is unsupportable speculation.  The only

18  real evidence before the court is the Debtor's audited balance sheets, professionally prepared

19  and verified by the Debtor's president as accurate.  No contrary evidence regarding solvency

20  was presented.[3]   Accordingly, the premise of insolvency on which <u>all</u> of the recoveries

21  against the Insiders are based, is without a factual basis and is highly questionable.

22        The Examiner's Report also states that  the transfer of the Debtor's fractional interest

23  in two loans to CTI Holdings ("CTI") in exchange for releasing a $600,000 loan CTI had

24  made previously to the Debtor "constituted an Insider Fraudulent Transfer avoidable under

25  NRS 112.190(2), and the transfer would likely be avoided to the full extent of the value of

26

27        _____

28        [3]Although the Assi Trust's counsel identified loans in default, and the existence of
    several loans to only two entities, there was no evidence presented of insolvency.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

the loans transferred to CTI." Examiner's Report, p. 16, ll. 18-20.  The Examiner's Report assumes the "face" value (or "par value") of the two loans was $1.45 million.  The transfer occurred in December 2010, at which time the Debtor and all other parties acknowledge that real property values had dropped substantially. Using the values provided by Sperry VanNess as of April 2013, the Debtor's fractional interest in the loans transferred to CTI would be worth no more than $297,000, which is less than half of the amount of the CTI loan and only 20% of the $1.45 million value alleged by the Examiner.  Furthermore, prior to the transfer, CTI held a perfected security interest in the Debtor's interest in the loans it transferred. There is no factual basis for the Examiner concluding that $840,681.37 could be recovered from CTI Holdings.

Finally, the Examiner's Report concludes that $1,636,904.14 could be recovered from Bank of Nevada ("BON").  Examiner's Report, p. 15, ll. 19-20.  In December 2010 the Debtor sold its fractional interest in what is identified as the Redwood Loan to Insiders, for the sum of $2,648,904.14, which was concurrently paid to BON for the release of its security interest in the Redwood Loan.  The Examiner argues that the value of the Debtor's interest in the Redwood Loan was far less than $2,648,904.14, that BON was undersecured, that the actual value of the Redwood Loan was $1,012,000.00,[4] and therefore BON received a preferential transfer of $1,636,904.14.  Examiner's Report, p. 15.

However, the Examiner's Report does not acknowledge that, as William Dyer testified, the Redwood Loan was purchased by the Insiders for an amount that exceeded its value based upon an express agreement that the proceeds would be paid to BON.  The Insiders specifically conditioned this purchase on an agreement that all proceeds from the sale would be paid to BON.  The payment was earmarked for BON.  Where money paid to the Debtor is earmarked by the payor to be distributed to a third party - in this case BON -

---

[4]The Examiner's Report contains no evidence of the value of the Redwood Loan, this amount is just the Examiner's estimate assuming property values had decreased in similar proportion to the other properties in the Debtor's portfolio.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd    - 11 -

1  the transfer is not preferential. This is known as the "earmarking doctrine". In the case of

2  In re Superior Stamp & Coin Co., Inc., 223 F.3d 1004 (9th Cir. 2000), the Ninth Circuit

3  followed a three-part test for determining whether a transaction qualifies for the earmarking

4  doctrine: (1) the existence of an agreement between the new lender and the debtor that the

5  new funds will be used to pay a specified antecedent debt, (2) performance of that agreement

6  according to its terms and (3) the transaction viewed as a whole does not result in any

7  diminution of the estate). See, also, In re Bohlen Enters., Ltd., 859 F.2d 561, 565 (8th Cir.

8  1988) (following same three part test); In re Kumar Bavishi & Assocs., 906 F.2d 942, 944

9  (34rd Cir. 1990) (following Bohlen, holding that "earmarking" requires agreement that funds

10  be used to pay specific debts); see also Stover v. Fulkerson (In re Bruening), 113 F.3d 838,

11  841 (8th Cir. 1997) (earmarking doctrine applies when third party pays down a debt of the

12  debtor because estate not diminished by transfer); Sierra Steel, Inc. v. S & S Steel Fabrication

13  (In re Sierra Steel, Inc.), 96 B.R. 271, 274-75 (9th Cir. BAP 1989) ("Under the earmarking

14  doctrine, when a third party advances or loans funds to the debtor with instructions to use the

15  funds to pay off another creditor, the funds are said to be earmarked for payment to a specific

16  creditor or creditors and do not become property of the debtor."); Sun Valley, Inc. v.

17  Silverman (In re Sun Failings, Inc.), 5 B.R. 538, 539 (Bankr. S.D. Fal. 1980) ("When a third

18  party loans money to a debtor for the specific purpose of repaying a designated debt, the

19  money never becomes part of the estate available for distribution to all creditors and,

20  therefore, no preference is created.").

21      The total of all claims identified as recoverable by the Examiner, assuming a full

22  recovery (as discussed more fully below), is $5,720,085. The Examiner's Report concludes

23  the Settlement Value for any litigation is between $4,500,000.00 to $6,000,000.00. The

24  Debtor believes this conclusion is extremely optimistic.[5] The maximum recovery should be

25

26      [5]At the hearing on July 19th the Examiner attempted to verbally amend his report to include additional damages during the questioning by Mr. Garman. Although this testimony

27  was not allowed, it has certainly raised concerns (at least to the Debtor) related to the accuracy of the Examiner's Report, as well as the disinterestedness of the Examiner.

28

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd    - 12 -

1    reduced based upon a recap of the Examiner's testimony regarding the likelihood of

2    recovery, as discussed below.

3                    **D.    The Numbers.**

4            At the Confirmation Hearing, the Court requested the parties to prepare an analysis

5    of the numbers in chart form.  The discussion set forth above in this brief is necessary in

6    order to put the numbers in perspective.  The Examiner identified the potential recovery as

7    consisting of  three separate categories:

8        $1,636,904.14        -        Potential preferential transfer to BON

9                                        Examiner's Report, p. 15, ll. 19-20

10       $  840,681.37        -        Potential fraudulent transfer to CTI Holdings
                                        Examiner's Report, p. 16, ll. 4-5
11       $3,242,500.00        -        Total potential fraudulent transfers to Insiders in 2007
                                        and 2008
12                                       Examiner's Report, pp. 18-22, 29

13       $5,720,085.00                 TOTAL MAXIMUM POTENTIAL RECOVERY

14   This represents the "best case scenario" of the total of <u>all</u> recoveries identified by the

15   Examiner, assuming complete success and recovery against all of the Insiders.  Although

16   other potential claims are discussed, including an analysis of the Debtor's loans "in

17   retrospect" (Examiner's Report, p. 26, ll. 1-4), no dollar amount was placed on any potential

18   recovery related to this item, due to lack of evidence and other reasons.  In his analysis the

19   Examiner uses the amount of $4,500,000.00 as the "Minimum Settlement Range," reducing

20   the Total Maximum Potential Recovery by 21% presumably for likelihood of recovery.

21   Examiner's Report, p. 39, l. 12.

22           The Examiner also acknowledges that the Debtor would most likely be required to

23   hire counsel on a contingency basis in order to pursue such claims.  Examiner's Report, p.

24   31, ll. 22-23.  According to the testimony of Mr. Kipperman, he performed no analysis

25   regarding the Debtor's ability to pay counsel on an hourly fee basis to pursue this litigation.

26   Indeed, absent reorganization, even the Debtor's ability to survive is in question.  The

27   Examiner testified that contingency counsel would likely charge 1/3 of any recovery, plus

28

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd

- 13 -

expenses.  The Examiner further testified that expenses would likely be in the range of $100,000.00.  The Debtor submits that this expense number is unreasonable.  Insolvency would need to be proven as of April 2007, which would involve expert testimony, likely from an appraiser, concerning valuations for over 50 properties back-dated by over 6 years. Judging by the costs incurred by the Debtor in this case to date, including multiple depositions, a more reasonable cost estimate would be $400,000.00 (which Debtor believes is still very conservative.)  Accordingly, the true "Minimum Settlement Range" recovery against the Insiders is as follows:

|  |  |  |
|---|---|---|
| $4,500,000 | - | Minimum Settlement Range per Examiner's Report |
| <$1,500,000> | - | 33% deduction for contingency attorneys' fees |
| <$ 300,000> | - | Deduction for costs |
| $2,700,000 | - | Minimum Settlement Range after 2-3 years of litigation |

In addition, the Debtor has reached an agreement to settle the MB-Bona claim for $3,000,000, which increases the amount required to be paid by the settling Insiders to $3,718,198.  Whether or not the Assi Trust's claim will be greater than the amount scheduled has not yet been determined by the Court.  Accordingly, making adjustments to the Examiner's opinions contained on Page 39 of his report, leads to a conclusion that the settlement is not only fair, it represents a recovery by the Unsecured Creditors of substantially more than they could potentially receive after several years of litigation.  A "side-by-side" comparison between the Examiner's analysis and the Debtor's more realistic assessment reveals the following (the asterisked numbers indicate the differences):

///

///

///

///

///

///

///

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd

- 14 -

## ANALYSIS OF FAIRNESS OF SETTLEMENT AND PLAN

| Value of Assets Other Than Cash and Avoidance and Insider Litigation | Examiner's Values | Debtor's Values |
|---|---|---|
| DSI "Likely" Value | $4,449,750.00 | $4,449,750.00 |
| Blanchard Settlement Value | $ 553,000.00 | $ 553,000.00 |
| Equipment | $ 15,000.00 | $ 15,000.00 |
| Contingency - Essex Recovery | $ 205,590.00 | $ 205,590.00 |
| Subtotal | $5,233,340.00 | $5,233,340.00 |
| Less Cost of Operations | $ (891,480.00) | $ (891,480.00) |
| Total Assets: | $4,331,860.00 | $4,331,860.00 |

| Value of Settlement/Plan | | |
|---|---|---|
| 15% Payment | $3,268,198.00 | $3,718,198.00* |
| Estimated Administrative Less Cash | $ 916,974.00 | $ 916,974.00 |
| Waiver of BON Unsecured Claim | $ 615,601.00 | $ 615,601.00 |
| Waiver of KTSK Claim | $ 60,000.00 | $ 60,000.00 |
| Insider Claims x 15% | $2,264,665.00 | $2,264,665.00 |
| | $7,125,438.00 | $7,575,438.00 |

| Total Asset Value | $4,331,860.00 | $4,331,860.00 |
|---|---|---|
| Minimum Settlement Range | $4,500,000.00 | $2,500,000.00* |
| | $8,831,860.00 | $7,031,860.00 |

| Value of Settlement/Plan | <$7,125,438.00> | <$7,575,438.00> |
|---|---|---|

| Shortfall (Excess) for Minimum Fairness | $1,706,422.00 | <$543,578.00> |
|---|---|---|

Using this analysis, after deducting the actual costs and contingency fees associated with any potential litigation recovery, according to the Debtor's analysis the Insiders are overpaying $543,578 in order to settle the potential claims against them. The Insiders have not only overpaid, but are assuming all of the risks related to managing the properties, paying the taxes owed, potentially losing some properties, and they are assuming the risks inherent with the volatility of the general economy.

### E.    Complexity, Expense, Inconvenience And Delay Of Litigation.

Although this analysis is fairly obvious, it bears mentioning. Even the Examiner acknowledges that the litigation is likely "to be drawn out, contentious and full of discovery

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd    - 15 -

requests and disputes. It will be time consuming and expensive, with fees and costs reaching hundreds of thousands of dollars on each side." Examiner's Report, p. 31, ll. 15-18. The Examiner testified that attorneys' fees could be in the range of $400,000, but that it would likely be necessary to employ an attorney on a contingency basis. The Examiner stated the likelihood of employing a contingency attorney for this litigation is "uncertain," however the Debtor believes it is unlikely. Examiner's Report, p. 31, ll. 22-23. Furthermore, as stated above, the costs will likely be $400,000.00 or more. The Examiner testified that the litigation would take six months. The Debtor, however, estimates that a more accurate estimate of time to go to trial is 18-24 months, plus potential appeals of 3 years or more. Even if a litigation were successful, creditors would not see a distribution for several years.

**F.    The Recharacterization Argument Is A Red Herring.**

A portion of the Examiner's Report discusses the merger between IFA and IFAC, and the possibility of recharacterization. Examiner's Report, pp. 33-36. Also, the Assi Trust and MB-Bona filed their Objection Of MB Bona And The Assi Trust To The Asserted IFA Capital "Claims" Pursuant To 11 U.S.C. § 502(b)(1) and Fed.R. Bankr.P. 3007(d)(7) and (e); Alternatively, Motion To Determine The Classification Of The asserted IFA Capital "Claims" Pursuant to 11 U.S.C. §1122 and Fed.R. Bankr.P. 3013 [DE 1654] (the "Recharacterization Motion"). There are substantial (and the Debtor believes insurmountable) legal hurdles to achieve recharacterization. For example, it would need to be shown that the obligation from IFA to IFAC was not really a debt, even though it was characterized as debt on the Debtor's balance sheets, reported as a liability on the Debtor's financial statements, and monthly interest payments were reported as payment on a debt on the Debtor's tax returns. But Debtor does not intend to analyze all of the legal requirements of recharacterization here. The bottom line is that no recharacterization motion was timely brought. The Assi Trust's Recharacterization Motion was only one more last ditch effort to derail the Debtor's Plan. What the Court recognized, and what was ignored by both the Examiner and the Assi Trust, is what the true consequences of recharacterization were. Nearly all of the creditors (including the Assi Trust), would be recharacterized as equity. As

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd                - 16 -

1  holders of equitable interest, they would receive no distribution.  The Debtor would only

2  have to pay the few creditors that existed outside of IFAC, and then could skate free without

3  paying any more debt.  This was a potential course of action that the Debtor believed was

4  unfair and chose not to take.

5  ### G.    The Desires Of The Creditors.

6  All of the creditors but three, the Assi Trust and Paul and Mary Pusateri, have voted

7  in favor of the Plan (pursuant to the settlement with MB-Bona, it will change its vote to

8  acceptance of the Plan).  Accordingly, eighty-six creditors voted in favor of the Plan, and

9  only three against.  All of the creditors except two elected to receive a cash distribution upon

10  confirmation.  This is an overwhelming expression by the creditors in favor of the Plan.  As

11  stated in A&C Properties, the views of the creditors is "considered paramount."  See also,

12  In re Bay Area Material Handling, 1995 U.S. Dist. LEXIS 18241 (N.D. Cal., Dec. 4, 1994)

13  (Bankruptcy court's approval of compromise was affirmed where it took into account that

14  only one disgruntled creditor objected to compromise, while all other creditors approved).

15  Furthermore, while the Court is required to give due deference to a creditor's objection to a

16  compromise, that objection is not controlling.  A & C Properties, 784 F.2d at 1382. See also,

17  In re Persistence Capital, LLC, 2007 Bankr. LEXIS 4906 (9th Cir. BAP, Nov. 5, 2007).

18  The testimony of Kevin Donahoe, the Chairman of the creditors committee, was

19  telling.  He explained that the unanimous vote of the Committee was in favor of the

20  Settlement, that they wanted to cash out, and that they had no desire to engage in prolonged

21  litigation against the Insiders.  He testified that this conclusion was reached after multiple

22  meetings and a thorough review of  reports from their accountants and advice from their

23  counsel.  Furthermore, the IFA Capital creditors are not all "family," as the Assi Trust's

24  counsel attempted to characterize them. Rather, only 19 of a total of 84 IFA Capital creditors

25  are family, meaning 77% of those creditors are not related.  Although the Examiner, as well

26  as the various counsel, may speculate as to what is best, it is ultimately the creditors' money

27  at stake, which is why their desire is paramount.

28  ///

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd

- 17 -

**H.  Consequence Of Not Confirming The Plan.**

At the risk of appearing self-serving, the consequences of not confirming the Plan are dire.  The case would likely convert to a Chapter 7. The likelihood of continuing to receive servicing fees and management fees is questionable.  As testified to by Mr. Donahoe, the Committee obtained proposals from several other loan servicers and they determined that the cost of replacing the Debtor would be prohibitive.  Existing clients with servicing contracts would have the right to terminate the contracts and to seek alternative servicers/managers. The Debtor would be embroiled in complex and expensive litigation with the Insiders (assuming contingency counsel could be obtained).

The DSI Report gave a "Liquidation Value" of the assets in the amount of $2,288,561, or 33% less than the "likely recovery" provided in its report based on an orderly liquidation. Based on the experience of Debtor's counsel, which may be shared by others who regularly practice bankruptcy law, the alternative to confirmation would be a drawn-out affair, spanning years, with extraordinary costs.   It is little wonder the creditors voted overwhelmingly in favor the Plan.

**4.    Conclusion.**

The Plan is fair and proposed in good faith.  The Insider Settlement is reasonable.  All creditors (except the Assi Trust and two others) support the Plan.  For all of the above reasons, the Plan should be confirmed.

DATED this 5th day of August, 2013.

LAW OFFICES OF ALAN R. SMITH

By:_____*/s/ Alan R. Smith*_____
ALAN R. SMITH, ESQ.
Attorney for Debtor

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\Integ Fin Assoc\Plan & DS\Plan (4th Amd) Post Trial Brief 080513-dlg.wpd